[No. B125295. Second Dist., Div. Five. May 31, 2000.]

OLIVER DUGGAL et al., Plaintiffs and Appellants, v.
G.E. CAPITAL COMMUNICATIONS SERVICES, INC., Defendant and
Respondent.

[No. B129637. Second Dist., Div. Five. May 31, 2000.]

OLIVER DUGGAL et al., Plaintiffs and Appellants, v.
AT&T CORP., Defendant and Respondent.

**COUNSEL**

A. Raymond Hamrick III and Raymond C. Dion for Plaintiffs and Appellants.

DeWitt & Roberts, David M. Roberts and Kelly C. Fitzgerald for Defendant and Respondent G.E. Capital Communications Services, Inc.

Jeffer, Mangels, Butler & Marmaro and Jeffrey K. Riffer for Defendant and Respondent AT&T Corp.

## OPINION

**GODOY PEREZ, J.**—Plaintiffs Oliver Duggal; Starfire Financial Services, Inc.; Michael Hauser, both individually and doing business as Global-Tel; and U.S. Refill-It, doing business as Supply Distribution Network, appeal from the judgments entered for defendants AT&T Corp. and G.E. Capital Communications Services, Inc., after their demurrers to the third amended complaint were sustained without leave to amend.[1] For the reasons set forth below, we affirm.

### FACTS AND PROCEDURAL HISTORY

These consolidated appeals arise from the practice of reselling long-distance telephone services provided by defendant and respondent AT&T Corp. (ATT). ATT sells phone time in bulk at a discounted rate to various resellers, including defendants Future Telcom, Inc. (Telcom), and Global-wise Communications, Inc. (Globalwise).[2] Those entities then resell the long-distance services to smaller customers, passing along only a portion of the volume discount received from ATT in order to make a profit.

Between August 1994 and January 1995, plaintiffs and appellants Starfire Financial Services, Inc. (Starfire), Global-Tel, and U.S. Refill-It, doing business as Supply Distribution Network (Supply Network) entered contracts with Telcom and Globalwise to act as their sales representatives or as independent contractors in reselling to retail customers the bulk phone services which Telcom and Globalwise bought from ATT.[3]

The Telcom agreements provided that appellants would buy phone services "wholesale" for further resale by appellants for their own account. In jurisdictions where appellants were not properly licensed to do so, they would act as Telcom's sales representatives. In the former event, appellants' relationship with Telcom was no more than a purchaser of services. In the latter, appellants were deemed Telcom's independent contractors. The Globalwise agreement provided that appellants were independent contractors

---

[1] These matters were separately appealed (cases Nos. B125295 and B129637) but were later consolidated by order of this court upon application of AT&T Corp.

[2] Telcom and Globalwise are not parties to this appeal.

[3] We will sometimes refer to Starfire, Global-Tel and Supply Network collectively as "appellants." Plaintiffs and appellants Oliver Duggal and Michael Hauser are the officers, owners or operators of appellants and when we refer to those companies, we include Duggal and Hauser by reference.

engaged to sell phone services to Globalwise customers. In exchange, both agreements provided that appellants would receive commissions based on the sales made on behalf of Telcom and Globalwise.

The operative third amended complaint alleged that ATT sold its services to defendant and respondent G.E. Capital Communications Services, Inc. (GE).[4] GE resold those services to other entities, including Telcom and Globalwise, for further resale. When appellants made sales, their accounts would be submitted to Telcom for initial processing and verification. Telcom would then pass the accounts on to GE for further processing, which would in turn pass them along to ATT for final processing, followed by the provisioning of services to and eventual billing of the ultimate users of the phone services.

Appellants sued Telcom and Globalwise, along with some of their officers or representatives, in June 1997. The third amended complaint alleged that Telcom and Globalwise defrauded appellants and breached their agreements in a variety of ways, including: lying about having a direct contractual relationship with ATT; failing to order services for customers obtained by appellants; failing to properly verify or account for bills paid by those customers; and failing to pay commissions owed.

The sixth cause of action for negligence named ATT and GE as defendants, contending they breached their respective duties of care by failing to timely provide or bill for services to customers obtained by appellants under appellants' agreements with Telcom and Globalwise. Appellants alleged that ATT and GE knew about their contracts with Telcom, had a history of billing and service delays, and knew the harm those delays would cause. As a result of ATT's and GE's negligent provision of or billing for services, appellants were damaged, they alleged.

Appellants' 12th cause of action sought an accounting from ATT and GE, alleging they held in trust money paid by appellants' customers. ATT and GE demurred to the sixth cause of action on the ground that they did not owe appellants any duty of care and were therefore not negligent. If that demurrer were sustained, then the accounting cause of action would necessarily fail, they contended. On May 29, 1998, the trial court sustained GE's demurrers without leave to amend but overruled ATT's demurrers. Judgment for GE was entered on June 29, 1998.

On June 29, 1998, ATT brought a motion to renew its demurrers based on a new decision by the United States Supreme Court—*American Telephone & Telegraph Co. v. Central Office Telephone, Inc.* (1998) 524 U.S. 214 [118

---

[4] We will sometimes refer to ATT and GE collectively as "respondents."

S.Ct. 1956, 141 L.Ed.2d 222] (hereafter *Central Office*). The *Central Office* decision—which we will discuss in detail *post*—arose on similar facts. ATT was sued by resellers of its long-distance phone services for failing to properly provide services and bill the' reseller's customers. The Supreme Court reversed a federal court jury verdict which awarded the plaintiff damages under state law for breach of contract and tortious interference with contract. The basis for this decision was the "filed rate doctrine," which holds that customers of telecommunications providers may not obtain services or remedies that conflict with the tariff or rate schedules the provider has filed with the Federal Communications Commission (FCC). Based on this decision, ATT argued that appellants' state law negligence claim was in conflict with its filed tariff and was thus preempted by the filed rate doctrine pursuant to the Federal Communications Act. ATT's renewed demurrers were sustained without leave to amend on November 3, 1998. The court ordered the third amended complaint dismissed as to ATT and entered judgment accordingly. These appeals followed.

## STANDARD OF REVIEW

█ In reviewing a judgment of dismissal after a demurrer is sustained without leave to amend, we must assume the truth of all facts properly pleaded by the plaintiff-appellant. Regardless of the label attached to the cause of action, we must examine the complaint's factual allegations to determine whether they state a cause of action on any available legal theory. Reversible error is committed if the facts alleged show entitlement to relief under any possible legal theory. (*Cochran v. Cochran* (1997) 56 Cal.App.4th 1115, 1119-1120 [66 Cal.Rptr.2d 337].) The plaintiff-appellant bears the burden of showing how the complaint might be amended to state a viable cause of action. (*Hendy v. Losse* (1991) 54 Cal.3d 723, 742 [1 Cal.Rptr.2d 543, 819 P.2d 1].) We will affirm an order sustaining a demurrer which is correct on any applicable theory. (*Kennedy v. Baxter Healthcare Corp.* (1996) 43 Cal.App.4th 799, 808 [50 Cal.Rptr.2d 736].)

We will not, however, assume the truth of contentions, deductions or conclusions of fact or law and may disregard allegations that are contrary to the law or to a fact of which judicial notice may be taken. When a ground for objection to a complaint, such as the statute of limitations, appears on its face or from matters of which the court may or must take judicial notice, a demurrer on that ground is proper. (Code Civ. Proc., § 430.30, subd. (a); *Cochran v. Cochran, supra*, 56 Cal.App.4th at p. 1120.) We may take judicial notice of the records of a California court. (Evid. Code, § 452, subd. (d).) We must take judicial notice of the decisional and statutory law of California and the United States. (Evid. Code, § 451, subd. (a).)

DISCUSSION

1.  *The Filed Rate Doctrine*

■ The Federal Communications Act (the FCA) requires telecommunication common carriers to file schedules, known as tariffs, with the FCC. These tariffs must show all charges and the classifications, practices and regulations affecting those charges. (47 U.S.C. § 203(a).) The contents of the tariff are subject to FCC approval. (47 U.S.C. § 203(b)(2).) These filed tariffs are the equivalent of federal regulations which have the force of law. (*Marcus v. AT&T Corp.* (2d Cir. 1998) 138 F.3d 46, 56; *Cahnmann v. Sprint Corp.* (7th Cir. 1998) 133 F.3d 484, 488.)

It is unlawful for any carrier to "extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule." (47 U.S.C. § 203(c).) These provisions are modeled after similar sections of the Interstate Commerce Act (ICA) and are intended to prevent unreasonable or discriminatory charges. (*Central Office, supra,* 524 U.S. at p. 221 [118 S.Ct. at p. 1962].)

As a result, the filed rate doctrine associated with the ICA applies to the FCA. Under this doctrine, the filed rate is the only lawful rate. Deviation is not permitted under any pretext. " '. . . Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination.' [¶] Thus, even if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff. [Citations.]" (*Central Office, supra,* 524 U.S. at p. 222 [118 S.Ct. at pp. 1962-1963].)

While the doctrine may sometimes seem harsh, its strict application is necessary to prevent carriers from intentionally misquoting rates as a means of offering rebates or discounts, the very evil the filing requirement seeks to prevent. Regardless of the carrier's motive—to either harm or help a particular customer—the policy of nondiscriminatory rates is violated when similarly situated customers pay different rates for the same services. (*Central Office, supra,* 524 U.S. at p. 223 [118 S.Ct. at p. 1963].) Another important purpose of the doctrine is to preserve the FCC's primary jurisdiction over the reasonableness of rates. (*Katz v. MCI Telecommunications*

*Corp.* (E.D.N.Y. 1998) 14 F.Supp.2d 271, 274.) The former purpose is known as the nondiscrimination strand of the filed rate doctrine and the latter is known as the nonjusticiability strand. (*Ibid.*)

The practical effect of the doctrine is to bar customers from suing to challenge a utility's failure to provide services at rates other than those stated in the tariff. (*Katz v. MCI Telecommunications Corp., supra,* 14 F.Supp.2d at p. 274.) A plaintiff injured by a carrier's failure to abide by its tariff obligations may either seek reparations in an FCC administrative proceeding or bring suit under the FCA. (*Cahnmann v. Sprint Corp., supra,* 133 F.3d at p. 487; 47 U.S.C. §§ 206, 207.)

The FCA contains a savings clause—47 United States Code section 414 —which provides that the FCA shall not "abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."

2. *The Central Office Decision*

The plaintiff in *Central Office* was a reseller of long-distance phone services purchased in bulk from ATT. The services were made possible through a system known as a Software Defined Network (SDN), the same system at issue here. When the plaintiff reseller experienced numerous errors and delays by ATT in providing or billing for those services, it sued in federal district court asserting Oregon state law claims. The jury eventually awarded damages under two theories. The first was for breach of contract based on representations that ATT would provide certain services over and above those listed in its FCC-filed tariff—to provision (provide services) within 30 to 90 days and to accurately allocate usage and charges among plaintiff's customers. The second was for tortious interference with contract, based on allegations that ATT, as a competitor of plaintiff, intentionally breached its contractual duties.

The Ninth Circuit affirmed, holding that the filed rate doctrine did not apply to provisioning and billing. The Supreme Court reversed, giving an expansive reading to the kinds of services and privileges which are covered under the filed rate doctrine. "Unsurprisingly, the cases decided under the ICA make it clear that discriminatory 'privileges' come in many guises, and are not limited to discounted rates. '[A] preference or rebate is the necessary result of every violation of [the analog to § 203(c) in the ICA] where the carrier renders or pays for a service not covered by the prescribed tariffs.' [Citation.]" (*Central Office, supra,* 524 U.S. at p. 224 [118 S.Ct. at p. 1663].) The court gave as examples decisions involving a carrier's promise to

deliver its load on a particularly fast train and a carrier's agreement to provide a shipper with a number of railroad cars on a specified day. Such special advantages, if not contained in the carrier's tariff and thus available to all, violated the filed rate doctrine. (*Ibid.*)

Turning to the facts before it, the Supreme Court held that enforcing ATT's promises outside the tariff would also violate the filed rate doctrine. The promise to provision within 30 to 90 days contradicted the tariff, which instead left it to ATT to set a due date for provisioning and merely make every reasonable effort to meet that date. If ATT failed to do so, the tariff permitted the reseller no recourse except cancellation of the order without penalty or payment of nonrecurring charges. "Faster, guaranteed provisioning of orders for the same rate is certainly a privilege within the meaning of 47 U.S.C. § 203(c) and the filed-rate doctrine. [Citation.]" (*Central Office, supra,* 524 U.S. at p. 225 [118 S.Ct. at p. 1964].)

As for ATT's promises to accurately allocate usage and charges among plaintiff's customers, the court pointed to a tariff provision which stated that ATT would not allocate usage and charges among plaintiff's customers and was not responsible for the way plaintiff might allocate usage or charges. "Any assurance by [ATT] that it would allocate usage and charges and take responsibility for the task would have been in flat contradiction of the tariff. [Citation.]" (*Central Office, supra,* 524 U.S. at p. 225 [118 S.Ct. at p. 1964].)

This analysis also applied to plaintiff's tortious interference claim, which was based on allegations that ATT, as a competitor of plaintiff, intentionally breached its contractual duties. Because the tort claim was "wholly derivative" of the contract claim, it too was barred by the filed rate doctrine. "Respondent can no more obtain unlawful preferences under the cloak of a tort claim than it can by contract. 'The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier.' [Citations.]" (*Central Office, supra,* 524 U.S. at pp. 226-227 [118 S.Ct. at p. 1965].)

The court also rejected the plaintiff's reliance on the FCA's savings clause, since that clause preserves only claims that are consistent with the tariff. "A claim for services that constitute unlawful preferences or that directly conflict with the tariff—the basis for both the tort and contract claims here—cannot be 'saved' under [47 U.S.C.] § 414. 'Th[e saving] clause . . . cannot in reason be construed as continuing in [customers] a common law right, the continued existence of which would be absolutely inconsistent with the provisions of the [FCA]. In other words, the [FCA] cannot be held to destroy itself.' [Citation]." (*Central Office, supra,* 524 U.S. at pp. 227-228 [118 S.Ct. at p. 1965].)

Chief Justice Rehnquist filed a separate concurring opinion, making clear that he joined the majority only because the tortious interference claim was wholly derivative of the breach of contract claim. (*Central Office, supra,* 524 U.S. at p. 229 [118 S.Ct. at p. 1966] (conc. opn. of Rehnquist, C. J.).) The filed rate doctrine preempts only those suits which seek to alter the terms and conditions of a tariff, the Chief Justice wrote. "The tariff does not govern, however, the entirety of the relationship between the common carrier and its customers. For example, it does not affect whatever duties state law might impose on [ATT] to refrain from intentionally interfering with respondent's relationships with its customers by means other than failing to honor unenforceable side agreements, or to refrain from engaging in slander or libel, or to satisfy other contractual obligations. The filed rate doctrine's purpose is to ensure that the filed rates are the exclusive source of the terms and conditions by which the common carrier provides to its customers the services covered by the tariff. It does not serve as a shield against all actions based in state law. . . ." (*Id.* at pp. 230-231 [118 S.Ct. at p. 1966] (conc. opn. of Rehnquist, C. J.).)

Justice Stevens dissented, based on his belief that the evidence supported the jury's verdict for willful misconduct by ATT which did not implicate its tariff or the filed rate doctrine. This included evidence that bills mailed by ATT to the plaintiff's customers disclosed the markup the plaintiff obtained and evidence that ATT telemarketers were "slamming" the plaintiff's customers—switching them from the plaintiff to ATT without authorization. This showed an intentionally tortious effort by ATT to interfere with the plaintiff's business relationships, a right which, if enforced, would not give the plaintiff an unlawful preference which should have been set forth in the tariff. (*Central Office, supra,* 524 U.S. at pp. 231-232 [118 S.Ct. at p. 1967] (dis. opn. of Stevens, J.).) "To the extent [the plaintiff's] tort claim is based on [ATT's] billing disclosures and slamming practices, it neither challenges the carrier's filed rates . . . nor seeks a special service or privilege . . . ." (*Id.* at p. 233 [118 S.Ct. at p. 1968] (dis. opn. of Stevens, J.).)

The majority answered Justice Stevens's dissent by pointing out that the issue of this noncontract evidence was not included within the question presented for the court's review and was not raised by the plaintiff as an alternative ground to support the judgment. Further, the plaintiff never challenged the characterization of its tort claim as being wholly derivative of its contract claim. (*Central Office, supra,* 524 U.S. at pp. 226-227, fn. 2 [118 S.Ct. at p. 1956].)

3. *The Filed Rate Doctrine Bars Appellants' Claims*

██ The *Central Office* court was interpreting and applying the same tariff provisions at issue here. Under section 2.5.10 of ATT's tariff, "[w]hen

an order for service is placed, a due date will be established and confirmed with the Customer." If provisioning is delayed more than 45 days after the due date, the customer may cancel the order without penalty or payment of nonrecurring charges. An action to enforce a side agreement to receive faster provisioning was barred by the filed rate doctrine. (*Central Office, supra*, 524 U.S. at p. 225 [118 S.Ct. at p. 1964].) Under section 6.2.4 of the tariff, ATT " 'will not allocate . . . usage or charges' " among the locations on the customer's network and " 'is not responsible for the way that the Customer may allocate usage or charges.' " An action to enforce a side agreement that ATT would take responsibility for doing so was also barred by the doctrine. (*Ibid.*)

Appellants' negligence claim against ATT seeks state common law negligence damages as a remedy for ATT's alleged failure to timely provision services which they ordered. In fact, appellants alleged, ATT (and GE) could both provision and bill in less than 45 days. As noted in *Central Office*, however, the tariff provided that ATT would establish a due date, with the customer permitted to cancel the order without charge if service were not provided within 45 days *after* the due date. To permit a state law damage award in such circumstances would violate the filed rate doctrine by in effect providing a disguised retroactive rate adjustment (see *Arkansas Louisiana Gas Co. v. Hall* (1981) 453 U.S. 571, 579 [101 S.Ct. 2925, 2931, 69 L.Ed.2d 856]) and by placing our state courts in the business of determining a reasonable level of service for matters subject to FCC regulation. (See *Chicago & N. W. Tr. Co. v. Kalo Brick & Tile Co.* (1981) 450 U.S. 311, 325 [101 S.Ct. 1124, 1134, 67 L.Ed.2d 258].) The same is true of appellants' attempts to hold ATT liable for its alleged failures to timely or accurately bill appellants' accounts.

Appellants try but fail to distinguish *Central Office*. They first do so by pointing to Chief Justice Rehnquist's concurring opinion and Justice Stevens's dissenting opinion in *Central Office*, which stated the filed rate doctrine did not apply to state law claims that did not implicate the terms of a filed tariff. The evidence Justice Stevens relied on was ATT's bills to the plaintiff's customers, which disclosed the markup the plaintiff made on its own charges, combined with ATT's practice of slamming the plaintiff's customers to ATT. Justice Stevens concluded that a claim for tortious interference with business relations based on such conduct was not precluded by the filed rate doctrine because it did not challenge ATT's filed rates or seek special services or privileges. (*Central Office, supra*, 524 U.S. at pp. 233-234 [118 S.Ct. at p. 1968] (dis. opn. of Stevens, J.).) Appellants' negligence claim, however, does seek special services or privileges not set forth in the tariff—the faster provisioning of services and proper billing of

appellants' account, along with the full range of compensatory damages allowed by common law.[5] (See *Day v. AT&T Corp.* (1998) 63 Cal.App.4th 325, 335-337 [74 Cal.Rptr.2d 55] [plaintiffs sued retailers of prepaid phone cards, seeking injunctive relief for false advertising practices and disgorgement of profits, contending defendants engaged in unfair business practices (Bus. & Prof. Code, §§ 17200, 17500); claims for injunctive relief to stop false advertising were not barred by the filed rate doctrine since the obligation to truthfully advertise rates was outside the scope of the tariffs, but claims for disgorgement of overcharges which conflicted with the tariffs were barred].)

Appellants also cite numerous federal decisions which they contend permit them, as competitors of ATT, to bring their negligence claim. Most are inapplicable, since each concerned the right to bring actions under competing provisions of federal antitrust law. (See *Essential Communications Sys., Inc. v. American Tel. & Tel.* (3d Cir. 1979) 610 F.2d 1114 [seller of phone equipment brought federal antitrust action, claiming ATT would not let its customers buy non-ATT phone equipment; FCC's filed rate doctrine did not bar the claim].) Appellants have alleged no such claim.[6]

Appellants' reliance on *Cooperative Communications, Inc. v. AT & T Corp.* (D.Utah 1994) 867 F.Supp. 1511, is also misplaced. The court there held that state law claims against ATT for interference with contract, business disparagement, unfair competition and trade secrets violations were not barred by the filed rate doctrine. A careful reading of the decision shows that the claims were similar to those which prompted Justice Stevens's dissent in *Central Office* because they were based on fraudulent misrepresentations made by ATT to the plaintiff's customers in an effort to disrupt the plaintiff's business relationships and did not attempt to enforce any misrepresentations contrary to the tariff. (*Id.* at p. 1519.)

As a companion argument, appellants contend the filed rate doctrine applies only to a telecommunication carrier's customers—defined by the GE tariff as buyers, resellers, or end-users of the phone services. Contending

---

[5]To the extent appellants' allegations concerning ATT's efforts to impose "roadblocks" to its resellers by servicing accounts slowly might be read to state a claim for tortious interference with business relations, we reject such a contention. First, as just noted, their cause of action seeks compensatory damages under common law for ATT's failure to provide services and privileges not set forth in the tariff. Justice Stevens's dissent, however, was based on evidence of misconduct which bore no relation to the tariff. Second, appellants have waived the argument by failing to raise it. Instead, their brief is confined to arguments in support of a negligence claim and no others.

[6]Further, the *Central Office* court was aware that the plaintiff in that action was also a competitor of ATT, since their competitive relationship formed the basis of the claim for tortious interference with business relations.

they fall into none of those categories, appellants believe they are exempt from the doctrine. This contention is unsupported by argument or citation to authority and fails to specify which status appellants claim as against respondents. We presume the source of this contention is the Telcom and Globalwise agreements, which provided that appellants were either buying bulk phone services for their own resale efforts or were engaged to resell those services on behalf of Telcom and Globalwise.[7]

If so, we believe the filed rate doctrine still applies. Under that doctrine, respondents and their resellers and end-users were all bound by the tariff terms. Respondents could not offer faster provisioning and prompt billing and their resellers and end-users could not require it. Yet appellants apparently contend they are free to impose the same obligations on respondents because they were a type of "indirect" reseller, having purchased phone services for resale from another reseller, or because they were the "direct" resellers' sales representatives, not the resellers themselves. As noted earlier, permitting appellants to do so would implicate both strands of the filed rate doctrine—the nondiscrimination strand because respondents would be obligated to provide services outside the tariff terms to appellants' accounts—and the nonjusticiability strand because our state courts would have to determine a reasonable level of service for matters subject to FCC regulation. (*Arkansas Louisiana Gas Co. v. Hall, supra,* 453 U.S. at p. 579 [101 S.Ct. at p. 2931]; *Chicago & N. W. Tr. Co. v. Kalo Brick & Tile Co., supra,* 450 U.S. at p. 325 [101 S.Ct. at p. 1134]; *Katz v. MCI Telecommunications Corp., supra,* 14 F.Supp.2d at p. 274.)

Respondents' tariffs have the same force of law as federal regulations. (*Marcus v. AT&T Corp., supra,* 138 F.3d at p. 56; *Cahnmann v. Sprint Corp., supra,* 133 F.3d at p. 488.) Our courts have held that tariffs filed with state agencies are binding on the public at large. (*Colich & Sons v. Pacific Bell* (1988) 198 Cal.App.3d 1225, 1234-1235 [244 Cal.Rptr. 714] [limitation of liability for negligence in phone company's tariff precluded suit].) While the issues on appeal do not call for a holding as expansive as that in *Colich,* that case does provide authority for a broader application of the filed rate doctrine than appellants suggest. We see no reason why its rationale should not apply when interpreting federal law and decline to immunize appellants from the tariff terms which govern respondents and their resellers and end-users. For purposes of the filed rate doctrine, someone who buys phone services from a reseller in order to resell them on their own, or who contractually agrees to perform the task of selling those services for a

---

[7]To the extent appellants purport to raise any other grounds in support of this argument, we deem them waived. (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700 [46 Cal.Rptr.2d 119].)

reseller, has no greater rights than the reseller to assert claims against a carrier based on a failure to provide services which conflict with the carrier's filed tariff.[8]

Appellants also rely on Public Utilities Code section 2106, which provides that a civil action for damages may be brought in state court as a result of actions by a public utility which violate state law or orders and regulations of the state Public Utilities Commission. They assert the applicability of this statute ipse dixit, without argument or citation to authority, and we therefore deem the issue waived. (*Landry v. Berryessa Union School Dist., supra,* 39 Cal.App.4th at pp. 699-700.) We alternatively reject this contention because it begs the question whether state law claims are preempted under the filed rate doctrine. Even if appellants had a cause of action permitted by Public Utilities Code section 2106, the filed rate doctrine would still apply.

One other provision of the ATT tariff which was part of the record but was not discussed by the parties also supports our decision—the limitation of liability clause. Under that clause, ATT's liability for willful misconduct was not limited by the tariff. All other claims "by a Customer *or by any others,* for damages associated with the installation, provision, termination, maintenance, repair or restoration of [service] [and subject to certain inapplicable provisions below] shall not exceed an amount equal to the initial period charge provided for under this tariff . . . [subject to any credit allowances allowed by the tariff]." (Italics added.)

It has long been recognized that a limitation on liability serves the public interest by lowering the utility's rate and is an inherent part of the rate. Limitation of liability provisions therefore bar claims for simple negligence and breach of contract. (*BellSouth Telecommunications, Inc. v. Kerrigan* (N.D.Fla. 1999) 55 F.Supp.2d 1314, 1319.) The limitation of liability in ATT's tariff—which the FCC approved—applies to appellants for two reasons. First, as discussed earlier, appellants were equally bound by the tariff provisions. Second, ATT's tariff was expressly made applicable to customers and "any others."

Our discussion and holding apply with equal force to GE. Its tariff included the following provisions, which we deem applicable: GE's liability for damages due to mistakes, omissions, interruptions, delays, errors or defects in furnishing services was limited to an appropriate reduction in charges for delays less than 30 days and cancellation without charge for

---

[8]Our holding in this regard should come as no surprise to appellants, at least in regard to their Telcom contracts, which expressly provided that the terms of any applicable tariffs took precedence over the contract terms.

longer delays; this limitation of liability controlled and GE "shall not be liable for any other direct damages, or any indirect, consequential, special, actual, or punitive damages, or for any lost profits *of any kind or nature whatsoever arising out of any furnishing of, or interruption in, service provided hereunder,* whether or not [GE] was aware of the possibility of such damages, absent a determination of willful misconduct by judicial or administrative proceedings"; and resellers of GE's services assumed "sole responsibility to provide all billing, collection, and customer service functions . . . ." (Italics added.)[9]

### 4. *The Accounting Cause of Action Must Fail*

The right to an accounting is derivative and depends on the validity of a plaintiff's underlying claims. Because the only other cause of action against ATT and GE was barred by the filed rate doctrine, appellants' 12th cause of action for an accounting must fail. (*Janis v. California State Lottery Com.* (1998) 68 Cal.App.4th 824, 833-834 [80 Cal.Rptr.2d 549].) The lone decision cited by appellants as contrary authority—*Civic Western Corp. v. Zila Industries, Inc.* (1977) 66 Cal.App.3d 1 [135 Cal.Rptr. 915]—in no way bears on the question whether an accounting cause of action may be stated absent liability on other underlying causes of action.

#### DISPOSITION

For the reasons set forth above, the judgments are affirmed. Respondents ATT and GE to recover their costs on appeal.

Turner, P. J., and Armstrong, J., concurred.

---

[9]Even though GE did not raise its tariff as a ground for its demurrers to the third amended complaint, we deem it proper to base our decision on this ground. GE's tariff was before the trial court as part of appellants' motion to reconsider the order sustaining GE's demurrers to the third amended complaint. Appellants did not object to GE's raising the filed rate doctrine issue on appeal and in fact placed it before this court by addressing it in their opening brief. Finally, since the tariff has the force of law (*Marcus v. AT&T Corp., supra,* 138 F.3d at p. 56) we are obliged to take judicial notice of it. (Evid. Code, § 451, subd. (a).)