[No. A094248. First Dist., Div. Five. Oct. 5, 2001.]

JOSEPH DEBRO, Plaintiff and Appellant, v.
THE LOS ANGELES RAIDERS, Defendant and Respondent.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.C and part II.D.

COUNSEL

Joseph Debro, in pro. per., for Plaintiff and Appellant.

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Kenneth G. Hausman and Kevin H. Lewis for Defendant and Respondent.

OPINION

**STEVENS, J.**—Joseph Debro appeals from a judgment following the sustaining of respondent's demurrer to his second amended complaint without leave to amend. Debro contends the trial court erred because one of his causes of action, based on the California False Claims Act (Gov. Code, §§ 12650-12655), was not time-barred. We disagree and affirm the judgment.

## I. Facts and Procedural History

On August 7, 1995, The Los Angeles Raiders (Raiders) and entities known as the East Bay Entities (the City of Oakland, the County of Alameda, the Oakland-Alameda County Coliseum Authority, the Oakland-Alameda County Coliseum Financing Corporation, and the Oakland-Alameda County Coliseum, Inc.) entered into certain agreements by which the Raiders would play professional football in Oakland through 2011. Under the terms of the master agreement, the Raiders would receive revenue from ticket sales, as well as loans to finance a training facility, and operation expenses. In addition, the Oakland-Alameda County Coliseum would be expanded and modernized. The East Bay Entities agreed to finance the stadium renovations and their other obligations through the sale of personal seat licenses, club seats, and luxury suites, as well as the issuance of bonds.

Under the loan agreement, which was part of the master agreement, the East Bay Entities authorized the Oakland-Alameda County Coliseum Financing Corporation (Financing Corp.) to loan up to $85 million to the

Raiders to finance the renovation of the stadium, $10 million to finance the construction and development of a training facility, and $53.9 million for operations purposes. The loan agreement set forth the methods of disbursement of the loan proceeds, the Raiders' repayment obligations, and the events of default and remedies. The loan agreement also granted the Financing Corp. a security interest to secure repayment of the loans. Article V of the loan agreement, entitled "NONRECOURSE OBLIGATIONS," stated that aside from certain limitations, "any claim . . . against Raiders based upon this Loan Agreement shall be non-recourse."

On August 15, 1995, Debro filed a lawsuit in Alameda County Superior Court against the City of Oakland, County of Alameda, and others, seeking to void and enjoin performance of the master agreement. The action was dismissed in April 1996, without explanation in the record.

In August 1997, Debro filed a lawsuit against the administrator of the Oakland-Alameda County Coliseum Authority (OACCA), a joint powers authority of the City of Oakland and the County of Alameda that was formed in connection with the 1995 Raiders transaction. The complaint sought damages for professional misconduct relating to the loan agreement and the construction contracts by which the Coliseum was renovated. The lawsuit was dismissed in June 1999 for Debro's failure to comply with local rules.

Debro filed the lawsuit at issue here on October 6, 1999, against the Raiders, the general partner of the Raiders, the Oakland-Alameda County Coliseum, Inc., the Tutor-Saliba Corporation (the contractor for the renovation of the Coliseum), and two individuals. His complaint charged, among other things, that the defendants conspired to defraud the taxpayers of the City of Oakland and the County of Alameda by "knowingly making using or causing to be made or using false statements to get false claims approved by the Oakland City Council and the Alameda [C]ounty Board of Supervisors." His action purported to state causes of action under six statutes, including Government Code sections 12650 and 12651 of the California False Claims Act (California Act).

Debro filed a first amended complaint in July 2000. He dropped all of the defendants except for the Raiders, and added the OACCA as a defendant. The new pleading charged the Raiders and the OACCA with violating the six statutes on which the original complaint was based, including Government Code sections 12650 and 12651 of the California Act.

The Raiders demurred to Debro's first amended complaint. As to two statutes that Debro conceded could not support a cause of action, the trial

court sustained the demurrer without leave to amend. As to the remaining four statutes, the court sustained the demurrer with leave to amend, directing him to "allege, if possible, facts that state cognizable causes of action under these statutes that are not barred by the applicable statutes of limitations." The court also granted Debro "leave to amend to join all necessary parties or to allege facts that demonstrate that such parties cannot be joined."

The second amended complaint (the one at issue here) was filed in November 2000. Its first three causes of action alleged that the Raiders and the OACCA violated Government Code sections 12650, 12651, and 23007 in entering into the loan agreement in August of 1995. The second cause of action, based on Government Code section 12651, charged that the Raiders "negotiated for and accepted $64.9 million of public money as a payment for relocating of the Raiders to Oakland and fraudulently conspired to hide the relocation payment in a public document by calling said relocation payment a loan in violation of Government Code Section 12651." A fourth cause of action pled that the Raiders and the OACCA conspired to violate these three statutes. As to the statute of limitations, Debro alleged that the limitations period did not begin running in August 1995, when the loan agreement was signed, because he did not discover the fraud until December 1997. Despite the trial court's admonishment to join all necessary parties, Debro did not name any additional parties.

In their demurrer to the second amended complaint, the Raiders and OACCA contended that (1) all of the causes of action were time-barred, (2) fraud was not pled with particularity, (3) no qui tam action could be brought under Government Code section 23007 (the statute on which the third and fourth causes of action were based), (4) necessary parties were not joined, and (5) the second amended complaint was ambiguous and unclear. Before the demurrers were heard, Debro dismissed OACCA as a defendant.

The court sustained the Raiders' demurrer without leave to amend as to the entire second amended complaint. This appeal followed.

II. DISCUSSION

According to his notice of appeal, Debro challenges only the dismissal of the second cause of action, which he brought under Government Code section 12651. In neither his notice of appeal nor his briefs does he challenge the dismissal of the first, third, and fourth causes of action. We therefore consider whether the trial court erred in sustaining the demurrer without leave to amend, only as to Debro's cause of action under Government Code section 12651. (See *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [188 Cal.Rptr. 115, 655 P.2d 317].)

## A. Standard of Review

■ On appeal from a demurrer sustained without leave to amend, we assume the truth of the allegations of the complaint and determine whether they state a cause of action and, if not, whether the defect may be cured by amendment. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) We will affirm the court's ruling if it is correct under any legal theory raised in the demurrer, whether the court relied on the theory or not. (*Hendy v. Losse* (1991) 54 Cal.3d 723, 742 [1 Cal.Rptr.2d 543, 819 P.2d 1].) The denial of leave to amend we review for abuse of discretion. (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 889-890 [6 Cal.Rptr.2d 151] (*Cantu*).)

## B. Statute of Limitations

■ A complaint fails to state a cause of action if the allegations disclose that the cause of action is barred by the applicable statute of limitations. (*Duggal v. G.E. Capital Communications Services, Inc.* (2000) 81 Cal.App.4th 81, 86 [96 Cal.Rptr.2d 383].) To decide whether Debro's cause of action under the California Act was time-barred, we begin with a brief overview of the California Act, and then ascertain what false claim Debro has alleged, interpret the statute of limitations in the California Act, and examine the complaint's allegations regarding the commencement of the limitations period.

### 1. The California False Claims Act

■ The California Act, set forth at Government Code sections 12650 through 12655, is intended to "supplement governmental efforts to identify and prosecute fraudulent claims made against state and local governmental entities." (*Rothschild v. Tyco Internat. (US), Inc.* (2000) 83 Cal.App.4th 488, 494 [99 Cal.Rptr.2d 721].)[1] In general, the California Act permits a governmental agency, or a qui tam plaintiff bringing an action on behalf of the government agency, to recover civil penalties and damages from any person who, for example, knowingly presents to the state or political subdivision a false claim for payment or approval. (§ 12651, subd. (a)(1).) The California Act was patterned after the federal False Claims Act (31 U.S.C. § 3729 et seq.). (*Rothschild, supra,* at p. 494 [citing legislative history].)[2]

Section 12652 sets forth three ways in which a lawsuit under the California Act can proceed. First, the Attorney General "shall diligently investigate" false claims involving state funds and may bring an action against

---

[1] Unless otherwise indicated, all further section references are to the Government Code.

[2] A "claim," for purposes of the California Act, includes "any request or demand for money, property, or services made to any employee, officer, or agent of the state or of any political subdivision . . . ." (§ 12650, subd. (b)(1).) A political subdivision includes a city, county,

violators. (§ 12652, subd. (a)(1).) Second, the prosecuting authority of a political subdivision "shall diligently investigate" false claims involving political subdivision funds and may bring an action against violators. (§ 12652, subd. (b)(1).) Third, a private person may bring an action, on behalf of himself as well as the state or political subdivision. (§ 12652, subd. (c)(1).) The private party is referred to as the qui tam plaintiff. (*Ibid.*)

Where, as here, a qui tam plaintiff has initiated the lawsuit, the complaint is sealed until the Attorney General or political subdivision decides whether to intervene and proceed with the case. (§ 12652, subd. (c)(2).) Specifically, the qui tam plaintiff serves the Attorney General with a copy of the complaint, along with a written disclosure of material evidence and information in support of his contentions. (§ 12652, subd. (c)(3).) If the matter involves only state funds, the Attorney General decides whether to intervene and proceed with the action. If the matter involves political subdivision funds, the Attorney General forwards a copy of the complaint and evidence to the political subdivision, which decides whether to intervene and proceed with the action. (§ 12652, subd. (c)(4), (7), (8).) If the Attorney General and political subdivision, as applicable, decline to intervene, the complaint is unsealed and the qui tam plaintiff may conduct the action. (§ 12652, subd. (c)(7)(D)(ii), (8)(D)(iii).) The complaint is then served on the defendant. (§ 12652, subd. (c)(9).) Regardless of who controls the qui tam action, the qui tam plaintiff is entitled to a percentage of any recovery obtained in the litigation. (§ 12652, subd. (g)(2)-(5).)[3]

### 2. *Debro's Allegation of a False Claim*

As we explained above, the California Act generally imposes liability for making knowingly untrue claims to a public entity in order to obtain money, property, or services. In particular, the California Act enumerates certain conduct for which liability may be imposed. (§ 12651, subd. (a).) As potentially applicable here, the California Act imposes liability on a person who: (1) knowingly *presents* a false claim to a political subdivision for approval, (2) knowingly makes or *uses* a false record or statement to get a false claim paid or approved by the political subdivision, or (3) *conspires* to defraud the political subdivision by getting a false claim allowed or paid. (§ 12651, subd. (a)(1)-(3).)

In his second amended complaint, Debro alleged that the Raiders "negotiated for and accepted $64.9 million of public money as a payment for

---

tax, or assessment district, or "other legally authorized local governmental entity with jurisdictional boundaries." (§ 12650, subd. (b)(3).)

[3]It appears these procedures were followed in the matter before us. The Oakland City Attorney's Office and the Alameda County Counsel's Office evaluated Debro's contentions and decided not to intervene or proceed with the matter.

relocating of [*sic*] the Raiders to Oakland and fraudulently conspired to hide the relocation payment in a public document by calling said relocation payment a loan in violation of Government Code Section 12651." According to the Raiders, Debro is asserting that the transaction or underlying agreements were fraudulent because the loan was actually a nonrecourse loan and was not backed by collateral. We think the Raiders' characterization is inaccurate. According to Debro's assertions in the trial court and in his reply brief here, the purported false claim was the Raiders' request and acceptance of $64.9 million in a wire transfer as a purported *loan*, when in fact it was a "payoff" or *gift*.[4] It was not, Debro maintains, the nonrecourse or collateral aspects of the loan that had been hidden by the Raiders, but the fact that the Raiders would not pay back the money.[5]

Viewing the allegations of the second amended complaint broadly, as we must, we conclude Debro's allegations are susceptible of this characterization. The alleged violation of the California Act, therefore, was the Raiders' presentation or use of the loan agreement to obtain funds, where the loan agreement falsely characterized the transaction as a loan. (See § 12651, subd. (a)(1)-(3).) With this cause of action in mind, we proceed to determine whether the time for bringing it elapsed before Debro filed his complaint.

### 3. *The Limitations Period Under the California Act*

Section 12654, subdivision (a), limits the period in which an action under the California Act may be filed: "[a] civil action under Section 12652 may not be filed more than *three years after the date of discovery by the official of the state or political subdivision charged with responsibility to act* in the circumstances or, in any event, no more than 10 years after the date on which the violation of Section 12651 is committed." (Italics added.)

Although there are no reported California state cases interpreting section 12654, subdivision (a), the standards we employ in interpreting statutes of

---

[4]Debro explains in his reply brief: "The loan is an FCA violation because it has no provisions for repayment . . . it will not be repaid . . . it was a loan agreement designed to look like a promissory note to deceive the public . . . it enabled Respondent Raiders to claim, by wire transfer, public money as a loan when it was a payoff." "Respondent Raiders requested and accepted the wire transfer of $54 million of public money as loan fund disbursements allowed under the authority of a document designed to look like a promissory note to hide from taxpayers that the money was a payoff for moving the Los Angeles Raiders back to Oakland. This transfer of taxpayer's money under a false claim is a violation of the California False Claim Act."

[5]The distinction is subtle but definite: although, as with a gift, a nonrecourse loan would generally provide no basis to compel repayment of the sums provided, at least with a nonrecourse loan there is a contractual obligation of repayment.

limitation have been well established. ██ Our function, as with the construction of any statute, is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In the first instance, we look to the plain meaning of the statutory language. If further analysis is necessary, we apply a reasonable and commonsense interpretation, avoiding absurdity. (See *DeYoung v. City of San Diego* (1983) 147 Cal.App.3d 11, 17 [194 Cal.Rptr. 722], overruled on other grounds, *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) ██ We also consider the legislative purpose and public policy particularly relevant to statutes of limitation. In general, the legislative purpose behind such statutes is to prevent plaintiffs from asserting stale claims. At the same time, public policy favors the resolution of claims on the merits. Therefore, in ascertaining a limitations period, we must strike a balance "between the public policy favoring extinction of stale claims and that favoring resolution of disputes on their merits." (*Samuels v. Mix* (1999) 22 Cal.4th 1, 13 [91 Cal.Rptr.2d 273, 989 P.2d 701].)

██ Mindful of these standards, our task is to interpret the phrase "[1] date of discovery [2] by the official of the . . . political subdivision charged with responsibility to act." (§ 12654, subd. (a).) Taking the latter subpart first, it is clear from the plain language of the statute that the "official of the . . . political subdivision charged with responsibility to act" pertains to the responsible persons with the City of Oakland and Alameda County. As to the "date of discovery," the analysis is somewhat more complex.

The Raiders refer us to the statute of limitations for causes of action under the federal False Claims Act, which they contend is analogous to Government Code section 12654, subdivision (a). Under the federal False Claims Act, a civil action must be brought by the later of: (1) six years after the violation, or (2) "3 years after the date when facts material to the right of action are *known or reasonably should have been known* by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed." (31 U.S.C § 3731(b)(2), italics added; see *U.S. ex rel. Hyatt v. Northrop Corp.* (9th Cir. 1996) 91 F.3d 1211, 1217 (*Northrop Corp.*).) The language of the federal statute, however, is noticeably different from the language in section 12654, subdivision (a). The federal statute dictates that the limitations period begins when material facts were "known or reasonably should have been known"; section 12654, subdivision (a) merely states that the limitations period under the California Act commences upon "discovery." Because of this difference in language, we are not persuaded that the operation of the federal limitations period necessarily dictates how we should interpret section 12654, subdivision (a).

As the Raiders also point out, however, the term "discovery" is not foreign to California's statutes of limitation. Long before the Legislature used that term in Government Code section 12654, it was used—and interpreted by California courts—in connection with the limitations period for causes of action based on common law fraud and mistake. (Code Civ. Proc., § 338, subd. (d).)

Code of Civil Procedure section 338, subdivision (d), includes common law fraud among the causes of action that must be asserted within three years. Under that provision, the cause of action for fraud does not accrue—and thus the limitations period does not start to run—"until the discovery, by the aggrieved party, of the facts constituting the fraud." (Code Civ. Proc., § 338, subd. (d).) The purpose of this provision is to promote the resolution of claims on the merits. Since fraud by its nature is often concealed from the victim, the provision protects fraud victims from having the limitations period run before they are even aware of the fraud. On the other hand, if the term "discovery" were viewed too literally, requiring awareness of every fact necessary for a fraud claim, a plaintiff could unduly delay the commencement of litigation by asserting ignorance of the ultimate fact of fraud. Accordingly, we have long interpreted Code of Civil Procedure section 338 to commence upon the discovery by the aggrieved party of the fraud *or* facts that would lead a reasonably prudent person to *suspect* fraud. (*Miller v. Bechtel Corp.* (1983) 33 Cal.3d 868, 875 [191 Cal.Rptr. 619, 663 P.2d 177] (*Miller*).)

We conclude it is appropriate to ascribe the same meaning to the term "discovery" in the context of Government Code section 12654, subdivision (a). As with fraud claims under Code of Civil Procedure section 338, this interpretation balances the policy of avoiding stale lawsuits with the policy of providing a reasonable time for a plaintiff to discover a false claim. Furthermore, our interpretation is consistent with the tenets of Civil Code section 19, which reads: "Every person who has actual notice of circumstances *sufficient to put a prudent man upon inquiry* as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact." (Italics added.) Consequently, circumstances which put a reasonable person on inquiry of a false claim are constructive notice of the false claim itself.

Our interpretation of the term "discovery" is also consistent with the construction of that term in the context of the limitations period for a criminal statute similar to the California Act. Penal Code section 72 makes it a crime to present for payment "any false or fraudulent claim, bill, account, voucher, or writing" to "any state board or officer, or to any county, city, or

district board or officer." Prosecutions for violation of Penal Code section 72 must be "commenced within four years after *discovery of the commission of the offense*, or within four years after the completion of the offense, whichever is later." (Pen. Code, §§ 801.5, 803, subd. (c).) The limitations period commences after " ' "one has knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on inquiry." ' " (*People v. Crossman* (1989) 210 Cal.App.3d 476, 480 [258 Cal.Rptr. 370], quoting *People v. Zamora* (1976) 18 Cal.3d 538, 562 [134 Cal.Rptr. 784, 557 P.2d 75].)

Debro offers no persuasive reason to adopt a different interpretation of the term "discovery." He argues that Code of Civil Procedure section 338 does not apply here because it "only applies to Plaintiff if Plaintiff has a duty to inquire. . . . Even if it applied to Plaintiff, Plaintiff did not discover the false claim violation until October 1999." Debro's argument has no merit, for several reasons. First, we are not *applying* Code of Civil Procedure section 338 to his cause of action for violation of the California Act, but are merely referring to it as an analogous statute. Second, whether Debro had a duty to inquire is not essential to our analysis. Government Code section 12654, subdivision (a), refers to the discovery "by the official of the state or political subdivision." We therefore examine the information known to the responsible persons at the City of Oakland and Alameda County, not Debro.[6] Third, *any* plaintiff has a duty to inquire once he becomes aware of facts that would make a reasonably prudent person suspect fraud. (*Miller, supra,* 33 Cal.3d at p. 875.) As we discuss in the following section, the facts known to the governmental entities would have put a reasonable person on inquiry notice. Fourth, Debro's assertion that he did not discover the violation until October 1999 contradicts the allegations of his second amended complaint, in which it is pled that he discovered the fraud in 1997.

Debro's other arguments regarding the construction of the statute of limitations under the California Act are also without merit. Primarily, he contends that "section 12654(a) of the FCA requires the statute to start to run on date [*sic*] of discovery *after vigorous investigation*, by responsible officials." (Italics added.) He points out that section 12652 requires the Attorney

---

[6]The knowledge of the qui tam plaintiff has been held to be relevant under the federal False Claims Act. (See *Northrop Corp., supra,* 91 F.3d at p. 1217 ["three-year extension of the statute of limitations begins to run once qui tam plaintiff knows or reasonably should have known the facts material to his right of action"].) Some basis exists for employing the same analysis under the California Act, since the qui tam plaintiff initiates the litigation, may prosecute the suit on behalf of himself as well as the governmental entity, and shares in any recovery. On the other hand, the plain language of section 12654, subdivision (a), refers only to the knowledge of the responsible representative of the governmental entity. We need not decide this issue, however, since the facts known to Debro (as we discuss in the next part) would have also placed a reasonable person on inquiry notice of a false claim, and thus commenced the limitations period, more than three years before the complaint was filed.

General and the prosecuting authority of the political subdivision to diligently investigate false claims, and then jumps to the conclusion that the "discovery" required to commence the limitations period under section 12654, subdivision (a), can only occur after the prosecuting authority has had the opportunity to investigate pursuant to section 12652. As a result, he argues, the false claim could not have been discovered by the City of Oakland and Alameda County representatives until Debro filed his qui tam complaint and sent it to the Attorney General.

Debro's argument is not supported by the language of section 12654, subdivision (a). Nowhere does the statute dictate that the responsible person at the political subdivision cannot be charged with inquiry notice until the qui tam plaintiff has filed his complaint and sent it to the Attorney General. Moreover, Debro's construction of the statute would result in absurdity. According to Debro's view, the time period within which a qui tam plaintiff could file a lawsuit under the California Act would start *whenever he filed his lawsuit*. This would permit the qui tam plaintiff to control the length of the limitations period, waiting as much as 10 full years after learning of the fraud before bringing suit. This is plainly not what the Legislature had in mind when drafting section 12654, subdivision (a). (Accord, *Northrop Corp.*, *supra*, 91 F.3d at p. 1217 [rejecting identical argument under federal False Claims Act].)

Debro's strongest argument—all but ignored by the Raiders—derives from a portion of the California Act's legislative history, attached to his opening brief as exhibit C. According to these documents, amendment 13 to a preenactment draft of the California Act added the following language, which we now find in section 12654, subdivision (a): "[no] more than three years after the date of discovery by the official of the state or political subdivision charged with responsibility to act in the circumstances." According to a summary of the amendment, "Amendment 13 would provide for a shorter statute of limitations of 3 years, instead of 10 years, when the violation is *known* to the public agency defrauded by the false claim." (Sen. Policy Com., Off. of Sen. Floor Analyses, Rep. on Assem. Bill No. 1441 (1987-1988 Reg. Sess.) Sept. 4, 1987, italics added.) Thus, Debro argues, the use of the word "discovery" in section 12654, subdivision (a) was intended to require *actual* knowledge of the violation before the limitations period would commence.

We find this legislative history to be entirely consistent with our interpretation of section 12654, subdivision (a). Under our interpretation, actual knowledge of the false claim *does* commence the limitations period, just as the legislative history suggests. Whether mere knowledge of facts which

could give rise to a false claim starts the limitations period, however, is *not* specifically addressed by the legislative history in amendment 13. On the key issue before us, therefore, the legislative history is silent. Given the Legislature's presumed understanding of the judicial interpretation of the term "discovery" in other statutes of limitation, it is reasonable to assume that it would have used a word other than "discovery" if it intended for the limitations period to commence only upon actual knowledge of a violation. (See *Williams v. Foster* (1989) 216 Cal.App.3d 510, 521 [265 Cal.Rptr. 15].) At bottom, in light of the strong public policy underpinning the judicial construction of that term in this context, the legislative history does not dissuade us from interpreting the term "discovery" as it has been defined in the context of Code of Civil Procedure section 338.[7]

Thus, we hold, the limitations period under section 12654, subdivision (a), commences when the "official . . . charged with responsibility to act in the circumstances" either knows of the false claim or knows of facts which would lead a reasonably prudent person to suspect it. We next apply that standard to the instant case, determining whether, based on the allegations of the second amended complaint, representatives of the City of Oakland and Alameda County either knew of the purported false claim or were aware of sufficient facts to put them on inquiry notice.

### 4. *Debro's Allegations with Respect to the Limitations Period*

■ As we have explained, Debro maintains the false claim was based on the loan agreement describing the transfer of funds to the Raiders as a loan rather than a gift. Whether the transaction was *falsely* described as a loan turns on the legal effect of the *language of the loan agreement*. As shown by allegations in the second amended complaint and the loan agreement attached thereto, the responsible governmental officials became aware of the language of the loan agreement by no later than August 7, 1995, when it was signed by the Alameda County Counsel (approving the document as to

---

[7]According to the Raiders, the use of the word "known" in the legislative history suggests an intent for the limitations period to be interpreted in a manner similar to the limitations period under the federal False Claims Act, which is triggered when material facts are "known or reasonably should have been known." This argument does not support the Raiders' position on appeal, however, because it suggests the California Legislature looked at the federal statute, embraced the word "known," and yet *rejected* the phrase "reasonably should have been known." At any rate, the Raiders' point is not well taken. We do not believe the Legislature relied on the federal limitations statute in crafting section 12654, subdivision (a), since it used the word "discovery" instead of the phrase "known or reasonably should have been known."

form) and others.[8] Additionally, the second amended complaint contains the language, "14 elected public officials . . . voted to fund this fraud," and "tried to hid [*sic*] and deny that this contract was a fraud." To the extent any of the governmental entities "conspired" with the Raiders to perpetrate a false claim, they would have known of the false claim by no later than August 1995.

Moreover, the facts known to Oakland and Alameda County officials in August 1995 reasonably put them on inquiry notice of the Raiders' purported intention to *treat* the transaction as a gift, whether that was the legal effect of the loan agreement or not. For example, from the terms of the loan agreement, they knew that "any claim . . . against Raiders based upon this Loan Agreement shall be nonrecourse." They were also directly warned (by Debro), before the loan agreement was signed, that the payment to the Raiders was actually a gift. According to a transcript of a July 25, 1995, Oakland City Council meeting (attached to the Raiders' request for judicial notice in the trial court) Debro protested: "Are all the loans to Al Davis and the Raiders guaranteed or collateralized? . . . [¶] What guarantees exist that the total $64 million in loan guarantees to Al Davis will ever be repaid? *Some people call them fees, some people call them loans, but if they're not secured and they're not collateralized, they are in fact gifts.*" (Italics added.)

That the mere knowledge of the nonrecourse nature of the loan would put reasonably prudent government officials on notice of a potential false claim (under the circumstances alleged in the case before us) is supported by the fact that it led Debro himself to suspect the purported loan was actually a gift—even before the loan agreement was signed. As explained in his opposition to the Raiders' demurrer to his first amended complaint, Debro "suspected something was wrong" with the transaction before the deal was signed in August 1995 and "warned elected officials and the taxpayers of the perils of this transaction." In opposing the Raiders' demurrer to the second amended complaint, Debro represented that he appeared at the July 25, 1995, Oakland City Council meeting to register his complaints about the transaction and questioned whether the loan was in fact a gift. Indeed, as shown by the second amended complaint, Debro's concerns in 1995 regarding the nonrecourse nature of the loan led him to discover the purported "false claim" less than two years later in 1997. Surely these facts, known in 1995, would have also put responsible government officials on notice to inquire

---

[8]The Oakland City Attorney, Oakland City Manager, Alameda County Counsel and Alameda County Board of Supervisors signed the master agreement, of which the loan agreement is a part, on August 7, 1995. A copy of the master agreement was attached to Debro's original complaint, but not to the second amended complaint. However, the loan agreement, which *was* attached to the second amended complaint, stated that the East Bay Entities signed the master agreement on August 7, 1995.

about a possible false claim. (The fact that government officials did not ultimately conclude there was a false claim merely reflects their *analysis* of the evidence, not the insufficiency of the evidence to trigger an inquiry.)[9]

Debro argues it was difficult to unearth the violation of the California Act because the document by which the Raiders obtained the funds was called a loan agreement, it was made to look like a promissory note, the repayment section was vague, the East Bay Entities represented that the loan would be repaid, and the Raiders publicly announced their intention to repay the loan. It is not necessary that all of the facts be discovered for the limitations period to commence. Section 12654, subdivision (a) merely requires that the responsible government officials be placed on notice of the facts giving rise to the claim, not that they learn of every detail or determine the particular legal theory the plaintiff would later assert. (See *Miller, supra,* 33 Cal.3d at p. 875.)

Finally, the cases on which Debro relies are inapposite and do not support his arguments. For instance, in *Anderson v. Brouwer* (1979) 99 Cal.App.3d 176 [160 Cal.Rptr. 65], the trial court erred in sustaining a demurrer to a complaint that alleged latent defects in construction of improvements to real property. Of course, the matter before us does not involve real property, and the time for commencing actions for latent defects in real property is governed by a very different statute of limitations. Furthermore, to the extent "discovery" of the defects was germane to the commencement of the limitations period in *Anderson*, the issue was not actual discovery, but "whether a reasonable inspection and investigation" would have *led* to discovery. (*Id.* at pp. 180-181.) The decision in *Bradler v. Craig* (1969) 274 Cal.App.2d 466 [79 Cal.Rptr. 401] pertained to the tolling of limitations periods for actions based on developing or continuing wrongs, where the nature, extent or permanence of the harm is difficult to discover. Even under those circumstances, the limitations period is tolled only until the time of discovery or *opportunity to discover* the facts. (*Id.* at p. 471.) As we have explained, the opportunity for Oakland and Alameda County (as well as Debro) to discover the purported false claim commenced more than three years before Debro filed his complaint.

Although it is generally unnecessary to allege facts showing the limitations period has not run, where the allegations of the complaint give rise to

---

[9]In his opening brief, Debro argues that the lawsuit he filed against the City of Oakland, Alameda County, and others in 1995 did not put local officials on notice of the facts underlying his false claim cause of action, since he never served the complaint upon them. Although the Raiders now chide Debro for focusing his opening brief on whether the 1995 complaint gave officials notice, his doing so is not surprising since that was *precisely* the argument the Raiders made in the trial court to get the demurrer sustained. In any event, we do not base our decision on whatever notice might have been provided by the filing of the complaint in 1995.

the inference that the limitations period *has* run, it is incumbent upon the plaintiff to plead facts demonstrating otherwise. Debro has not alleged when the officials charged with responsibility discovered the purported false claim. Nor has he pleaded facts explaining why government officials would not have discovered the purported false claim by the time the loan agreement was signed. There is only one reasonable inference to be gleaned from the allegations of the second amended complaint on this subject—that the limitations period expired before the complaint was filed in October 1999.

C., D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

III. Disposition

The judgment is affirmed.

Jones, P. J., and Simons, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 23, 2002.

---

*See footnote, *ante*, page 940.