Jeffrey JOHNSON, et al., Plaintiffs,

v.

**HEWLETT–PACKARD COMPANY, Defendant.**

**No. C 09–03596 CRB.**

United States District Court, N.D. California.

Aug. 12, 2011.

Barry Ira Dunn, Franklin David Azar, Franklin D. Azar & Associates, P.C., Meghan Welch Martinez, Nathan J. Axvig, Richard Paul Barkley, Tonya L. Melnichenko, Aurora, CO, Christopher D. Banys, Daniel McArtur Shafer, Dara Lynn Grisbee Hegar, The Lanier Law Firm, Palo Alto, CA, W. Mark Lanier, The Lanier Law Firm, PLLC, Houston, TX, for Plaintiffs.

Anne Mary Brafford, Morgan Lewis & Bockius LLP, Irvine, CA, Barbara I. Antonucci, Littler Mendelson, P.C., Jennifer P. Svanfeldt, Morgan, Lewis & Bockius LLP, San Francisco, CA, Melinda S. Riechert, Morgan, Lewis & Bockius, LLP, Palo Alto, CA, Richard W. Black, Littler Mendelson, P.C., Robert J. Smith, Morgan Lewis & Bockius LLP, Washington, DC, for Defendant.

## MEMORANDUM AND ORDER DENYING MOTION TO AMEND AND GRANTING MOTIONS FOR SUMMARY JUDGMENT

CHARLES R. BREYER, District Judge.

This is an employment compensation putative class action "aris[ing, in Plaintiffs' view] out of [Hewlett–Packard's ("HP")] acknowledged failures over the past several years to record timely and accurately the sales of its equipment and services; and to calculate properly, and pay timely, the commissions and bonuses ... owed to HP's sales representatives...." Third Am. Compl. (dkt. 69) ¶ 1.

Several Motions are presently before the Court. First, Plaintiffs move for leave to file a Fourth Amended Complaint to "clarify" the nature of their attack on HP's incentive pay system. Mot. to Am. Compl. (dkt. 180). Second, HP moves for summary judgment as to each named Plaintiff's claims and has filed comprehensive Objections to Plaintiffs' evidence. Dkts. 140 (Summ. J. re Reise), 147 (Summ. J. re Johnson), 148 (Summ. J. re Purvis), 153 (Summ. J. re Simmons), 218 (Objections to Evidence). Third, each party has filed an Objection regarding discovery orders. Dkts. 221 & 225.

HP might have underpaid, and/or paid late, some of its sales representatives. However, Plaintiffs lack sufficient evidence to create a triable issue as to whether *they* were underpaid or paid late. Further, it is too late for Plaintiffs to amend their Complaint, for a fourth time, to "clarify" the nature of their challenge to HP's incentive pay compensation system. Therefore, (1) Plaintiffs' Motion to Amend is DENIED; (2) HP's Motions for Summary Judgment are GRANTED; and (3) the discovery rulings leading up to the filing of these Motions are affirmed.

## I. MOTION FOR LEAVE TO AMEND

### A. Background

The currently operative Complaint (the Third Amended Complaint), filed July 21, 2010, contains the following allegation: "HP has protested that its failures [to properly pay wages] are due to flaws with the computer software system—known as Omega—that records sales and calculate[s] commissions." Third Am. Compl. (dkt. 69) ¶ 2. "Omega" refers both to a computer program/system by that name and, at least to HP's sales representatives, also to HP's entire incentive compensation system. Plaintiffs assert that, when they drafted the original Complaint and subsequent amended Complaints, they intended "Omega" to have the broad definition (HP's entire incentive pay system) and did not realize that it also had a narrow "technical" meaning within HP. *Id.* Further, Plaintiffs claim that they "reasonably understood that Omega was synonymous with HP's entire sales commissions com-

pensation system, and they had no basis for amending their Complaint to expressly define the term" prior to HP's Motions for Summary Judgment. Mot. to Am. Compl. (dkt. 180) at 12.

In light of those Motions, however, Plaintiffs now assert that HP (and, as will be discussed in more detail below, the Special Discovery Master and Magistrate Judge Zimmerman) were improperly using the narrow, technical definition of "Omega" (i.e., that it is a computer program) to artificially restrict discovery and constrict their case on summary judgment. To correct the misunderstanding as to the meaning of "Omega" and to make their attack on HP's incentive pay system clear, Plaintiffs propose to add the following "definition" of Omega to the Complaint:

> "Omega" and "Omega system(s)" mean the entire commission/incentive pay compensation system, process, or processing system used, refined, or developed by HP since at least 2004 to calculate, compute or otherwise ascertain commissions/incentive pay for HP sales representatives. The terms "Omega" and "Omega system(s)" include but are not limited to, all engines, tools, databases, data feeds, data warehouses, indirect seller sources, programs, servers, software, hardware, or systems that feed into, stand behind, or relate to that commission/incentive pay compensation system.

*Id.* at 1.

Whatever understanding Plaintiffs might have had as to the meaning of "Omega" at the outset of this case,[1] three

---

**1.** Plaintiffs' assertion that they believed at the outset of this lawsuit that "Omega" referred only to HP's entire incentive pay compensation system is belied by a January 22, 2010 Joint Case Management Statement. Dkt. 23. In that Statement, Plaintiffs described their case "as a class action on behalf of current and former HP employees who sold HP's

services and equipment, but were not paid their earned commission and bonuses *because of a system-wide computer glitch in a system known as "Omega." Id.* at 2 (emphasis added)." The assertion that HP failed to pay earned commissions because of a "computer glitch" in "Omega" is inconsistent with Plaintiffs' current position that they always under-

rulings from this Court, Magistrate Judge Zimmerman, and special discovery master Judge Warren, certainly in combination, clearly put them on notice that their purported understanding of "Omega" was not the only one and certainly was not the one being used by HP or the Court.

First, in July 2010, in an Order denying HP's Motion to Dismiss Plaintiffs' contract claims, this Court noted that (1) "Plaintiffs claim they earned commissions that, *because of a computer glitch*, were never paid, or at the very least were paid late" and (2) the common breach suffered by putative class members was that "[HP] failed to pay the commissions to which Plaintiffs were entitled *because of a computer error.*" July 6, 2010 Order (dkt. 62) at 5–6 (emphasis added).

Second, on September 27, 2010, Magistrate Judge Zimmerman denied Plaintiffs' discovery requests other than those concerning "malfunctions of OMEGA." Sept. 27, 2010 Order (dkt. 86) ¶ 4 ("The Court construes requests for production numbers 4 and 5 as inquiring about disputes which involve a malfunction of OMEGA."), ¶ 5 ("Plaintiffs fail to limit [ ] request [number 7] to documents relating to malfunctions with OMEGA."), ¶ 7 ("Plaintiffs fail to limit [requests 14 and 16] to documents stemming from alleged problems caused by OMEGA.").

Finally, and perhaps most significantly, on January 27, 2011, Judge Warren, acting as Special Discovery Master, issued a written Order on the meaning of "Omega"

following an extensive review of the allegations in the Third Amended Complaint.

Plaintiffs have alleged that "Omega" refers to a computer program bearing that name, and that HP's compensation system is derivatively known as "Omega." *The Referee thus rules that Plaintiffs' use of "Omega" is to a computer program or a system of that name, and not an "ecosystem" of which Omega is merely a part.*

Order Re Initial Discovery Disputes (dkt. 137) at 5 (emphasis added).[2]

\* \* \*

Almost two months after Judge Warren's ruling, on March 24, 2011, Plaintiffs filed a Motion for Leave to Amend to "clarify" what they mean by "Omega" and the scope of their attack on HP's incentive pay compensation system.

## B. Legal Standard

After a party has amended as a matter of course, further amendment is allowed only with consent of the opposing party or leave of the court. Fed.R.Civ.P. 15(a). Leave of court "shall be freely given when justice so requires." *Id.*

 Courts are to consider five factors in deciding whether to grant leave to amend. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Those factors are (1) undue delay in seeking amendment; (2) repeated failure to cure deficiencies by prior amendment; (3) undue prejudice to the opposing

stood "Omega" to refer to HP's entire incentive pay system and not also to a computer program within that system known as "Omega."

**2.** On April 21, 2011, Judge Warren issued a follow-up Order on the issue of the meaning of "Omega." Among other things, he noted that (1) "[f]rom the beginning of the Master's involvement in this case, what is and what

isn't 'Omega' has been disputed by the parties. The Master resolved that issue finally [on] January 27, 2011, from which Plaintiffs did not appeal"; and (2) "Plaintiffs have offered no reason for their decision to wait two months after they learned that their definition of Omega was more restricted than they wished it to be before filing their Motion to Amend." Apr. 21, 2011 Order (dkt. 193) at 2–3.

party; (4) bad faith or dilatory motive; and (5) futility of amendment. *Id.*

### C. Discussion

#### 1. Plaintiffs Have Unduly Delayed Seeking Amendment

■ A party unduly delays seeking amendment by failing to seek amendment reasonably promptly after it "knew or should have known" that amendment was called for. *See AmerisourceBergen Corp. v. Dialysist W., Inc.,* 465 F.3d 946, 953 (9th Cir.2006).

■ Plaintiffs assert that it was not until HP argued for a narrow construction of the meaning of "Omega" in HP's Motions for Summary Judgment that "[Plaintiffs] conclude[d] that the Complaint should be amended to clarify any confusion about the meaning of 'Omega.'"). Mot. to Am. Compl. (dkt. 180) at 12. This ignores not only the allegations in the Third Amended Complaint describing Omega as a software program[3] but also (1) Plaintiffs' description of their case in the Joint Case Management Statement and Oppositions to HP's Motions to Dismiss and (2) the discovery Orders discussed above.

For example, Judge Warren noted that the meaning of "Omega" in the Third Amended Complaint was disputed at least from the time he entered the case in mid-December 2010. Apr. 21, 2011 Order (dkt. 193) at 2–3. Even before that, in January and February 2010, Plaintiffs summarized their allegations to this Court as involving computer malfunctions and glitches. Joint Case Management Statement (dkt. 23) at 2 ("Plaintiffs filed this case as a class action on behalf of current and former HP employees who sold HP's services and equipment, but were not paid their earned commission and bonuses *because of a system-wide computer glitch in a system known as "Omega."*") (emphasis added); Opp'n to Mot. to Dismiss (dkt. 40) at 3 ("HP uses a *computer system, known as Omega,* to track the sales made by its representatives. Omega does not function properly, and has not recorded a large number of sales made by HP's sales representatives. *Because of Omega's malfunctions, HP's sales representatives have not been paid all of the commissions and bonuses owed to them.*") (emphasis added). The Court relied on Plaintiffs' narrow expression of the common issue in this case, at least in part, in denying HP's motion to dismiss and/or strike class allegations. *See* July 6, 2010 Order (dkt. 60) (describing the Complaint as alleging a "computer glitch"). Further, in September 2010, Magistrate Judge Zimmerman denied Plaintiffs' discovery requests that went beyond documents related to OMEGA malfunctions. Sept. 27, 2010 Order (dkt. 86).

The combination of (1) the Third Amended Complaint's allegations regarding Omega, (2) Plaintiffs' representations as to what their case was about, (3) this Court's Order characterizing the Third Amendment Complaint's allegations, and (4) the discovery rulings should have put Plaintiffs on notice, at least as of September 2010, of the need to amend to "clarify"

---

**3.** For example, Plaintiffs:
- allege that HP's failure to pay wages is "due to flaws with the computer system—known as Omega—that records sales and calculate[s] commissions." Third Am. Compl. (dkt. 69) ¶ 2.
- seek an injunction barring "use of the malfunctioning Omega system ..." *Id.* ¶ 3.
- wish to represent a class "whose sales, commissions and/or earnings were tracked

by the Omega computer system used by HP...." *Id.* ¶ 55, 56.
- assert that class treatment is appropriate because (1) "use of the Omega computer system (and its accompanying data feeds/software)[]" is common to all putative class members, and (2) "[t]he malfunctions of the Omega computer system (and its accompanying data feeds/software) ..." caused them harm. *Id.* ¶ 58.

their intended meaning of "Omega."[4] At the absolute latest, Plaintiffs knew or should have known of the need for amendment when Judge Warren issued his January 27, 2011 Order construing Omega to mean "a computer program or system of that name[.]" Jan. 27, 2011 Order (dkt. 137) at 5. Plaintiffs waited an additional two months after Judge Warren's January 27, 2011 Order before seeking leave.

\* \* \*

In sum, Plaintiffs unduly delayed seeking amendment on a critical issue in this case—assuming *arguendo* that HP had problems with its incentive pay system, were those problems caused by a "computer glitch" or instead by widely divergent issues related to how information was provided to the incentive payment system in the first place. Plaintiffs might have taken an expansive view of the meaning of Omega and the cause of HP's alleged underpayment of incentive pay when they filed suit. But that is not how they framed their case to the Court, and long before Plaintiffs sought amendment they should have been disabused of any belief that their broad view as to the meaning of Omega and the scope of this case was shared by HP or the Court.

### 2. Failure To Cure Deficiencies By Prior Amendment

Plaintiffs are seeking to file a Fourth Amended Complaint. No prior amendments have addressed this issue.

### 3. HP Will Be Unduly Prejudiced If Leave To Amend Is Granted

Plaintiffs frame their sought after amendment as a mere "clarification" of the parties' existing understanding as to the scope of Plaintiffs' claims. Mot. to Am. Compl. (dkt. 180) at 5–7. In fact, the sought after amendment is not nearly so minor.

Instead, allowing Plaintiffs to amend to "clarify" that they are challenging HP's entire incentive pay system would require dramatically expanding discovery on the eve of summary judgment. HP prepared its summary judgment Motions following extensive discovery on what HP (and the Court) believed was Plaintiffs' theory of the case—that a computer malfunction caused HP to underpay its sales staff. Indeed, HP has answered 112 requests for production, and Plaintiffs have exhausted their limits on depositions and interrogatories. Allowing amendment would require *postponement of the summary judgment process* and result in Plaintiffs taking new discovery to attempt to show that HP did not provide Omega with the proper information in the first place. That evidence—the "raw data" (e.g., invoices, sales records, shipping records, and warranty information) behind HP's incentive pay process—is very different from the evidence Plaintiffs obtained regarding alleged Omega malfunctions.[5] Indeed, Plaintiffs essentially want to press a discovery reset button now that the "computer glitch" theory has not borne fruit.

This late-inning knuckleball would create the sort of moving target courts find to

---

4. In October 2010 Plaintiffs deposed Todd Hatfield, head of Sales Compensation for HP's Graphics Business. He told them that "people use 'Omega' as a term when they're talking about the actual piece of software or people also use 'Omega' in reference to the whole [compensation] process." Hatfield Depo. Tr. (dkt. 181–2) at 41:10–13.

5. The Special Master has recently ordered HP to produce raw data from which Plaintiffs could attempt to reconstruct what they were owed and thereby show that they were actually paid less by Omega than they were entitled to under their contracts. Discovery Management Order ("DMO") 10 (dkt. 210) at 1–2. The Court discusses DMO 10 in more detail below.

be unduly prejudicial. *See Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 798–99 (9th Cir. 1991) (affirming denial of motion to amend complaint notwithstanding plaintiff's characterization of amendments as "implicit" in early pleadings because, among other things, amendments were sought long after lawsuit was filed and after discovery was over); *Gaston v. Exelon Corp.*, 247 F.R.D. 75, 84 (E.D.Pa.2007) (denying leave to amend because, in part, "clarification" complicated the question of class certification); *see also Roberts v. Az. Bd. of Regents*, 661 F.2d 796, 798 (9th Cir.1981) (affirming district court's order denying motion for leave to amend when party wanted to add new claim "at the eleventh hour, after discovery was virtually complete, and [a] motion for summary judgment was pending before the court.").[6]

Under these circumstances, HP will be unduly prejudiced if amendment is granted.[7]

#### 4. Bad Faith

Whether Plaintiffs' failure to seek amendment until this stage of the litigation is the result of mere "undue delay" or "bad faith" is not clear on the present record. Plaintiffs (1) presented a fairly narrow construction of the allegations in the operative Third Amended Complaint to this Court in a Case Management Statement and in seeking to avoid dismissal, (2) failed to direct this Court to seemingly critical procedural events relevant to their Motion to Amend (such as Judge Zimmerman's and Judge Warren's rulings shaping the scope of relevant discovery), and (3) did not promptly seek amendment even after Judge Warren made inescapably clear that amendment was necessary. In any case, this Court need not find bad faith to deny leave to amend where, as here, Plaintiffs unduly delayed seeking amendment and HP would be prejudiced.

#### 5. Futility

This factor is not relevant here because the sought after amendment does not add claims. Rather, it expands the factual universe that might support existing claims.

#### D. Conclusion Re Motion For Leave To Amend

Plaintiffs either took a calculated risk by framing their case narrowly in the hopes that class certification would be appropriate or unreasonably failed to appreciate that their broad understanding of the scope of their case was not being shared by HP or the Court. In either case, now that the "computer glitch" theory has not panned out, Plaintiffs are trying to refit a new theory within their existing Complaint. But given the stage of this litigation and the extensive discovery already taken, this type of bait and switch tactic is not acceptable. Accordingly, leave to amend is DENIED.

### II. MOTIONS FOR SUMMARY JUDGMENT

HP has filed Motions for Summary Judgment directed to each named Plaintiff,

---

**6.** Plaintiffs cite *Moore v. Old Canal Financial Corp.*, No. CV05–205–S–EJL, 2006 WL 851114 (D.Idaho Mar. 29, 2006) and *Jimenez v. Sambrano*, No. 04cv1833 L(PCL), 2009 WL 937042 (S.D.Cal. Apr. 6, 2009) in support of their assertion that HP will not be prejudiced by their "clarification" amendment. Both of these cases are distinguishable as both involved *pro se* plaintiffs, and the court found that the proposed amendments (in *Moore* to "clean up" allegations already made by a *pro se* party and in *Jimenez* to add a claim for punitive damages) did not materially change the lawsuit.

**7.** Plaintiffs point out correctly that discovery is not technically closed and no trial date has been set. The reality, however, is that extensive discovery has already taken place, and Plaintiffs did not seek amendment until after HP filed its Motions for Summary Judgment.

arguing that none has sufficient (or any) evidence to create a genuine dispute of material fact as to whether s/he was not paid everything s/he was owed. Plaintiffs' opposition is based almost exclusively on evidence that, as a general matter, HP experienced problems with its incentive pay system and those problems were widespread.[8] Because Plaintiffs lack sufficient evidence to create a triable issue as to whether they were actually harmed by any of the problems HP experienced, HP is entitled to summary judgment.

## A. Background

### 1. The Basics Of HP's Compensation System

HP's sales representatives operated under unilateral, at-will employment contracts. Wesoky Decl. (dkt. 191) Ex. 10. Under those contracts, sales representatives received a base salary, incentive pay based on sales, and additional performance bonuses based on sales. *Id.* Ex. 11. Each sales representative was assigned a territory and/or specific customers, and they worked that territory and/or those customers. *Id.* Ex. 13. Sales representatives were supposed to receive credit and incentive pay on sales of identified product lines made in their assigned territory or to their assigned customers. *Id.* Ex. 14. Incentive pay for certain sales representatives was calculated on the basis of a ratio between an initial sales target ("quota") and actual sales made. *Id.* Ex. 15. Properly calculating a particular representative's incentive pay thus required knowing (1) the representative's quota (if he had one); (2) the product lines for which the representative was to receive credit; and (3) the amount of sales made in the relevant territory and/or to the relevant customers.[9] *Id.* Exs. 15–17. Sales crediting occurred when "all required data [was] captured" by HP. Slaby Decl. (dkt. 145–1) ¶ 28 (citations omitted). Obviously, if HP did not receive the "required data" from the reporting reseller or partner, or received it "late," a sales representative was not credited for the sale or the credit was delayed. Wesoky Decl. (dkt. 191) Ex. 32, July 19, 2010 Pruss Depo. at 25:16–18. Sales representatives were supposed to review sales crediting on a monthly basis and report errors. Slaby Decl. (dkt. 145–1) ¶ 34 (citations omitted).

Although HP advanced incentive pay (or "draws" as an estimate of incentive pay)[10] on a monthly basis, incentive pay was not

---

**8.** HP has objected to almost all the evidence produced by Plaintiffs. *See generally* Dkt. 218. Generally speaking, HP asserts that all or nearly all of Plaintiffs' evidence is irrelevant (or its limited relevance is outweighed by its prejudicial effect), unauthenticated (even though it was produced by HP), and hearsay. It is not necessary to rule on these Objections because, even assuming the evidence is admissible, Plaintiffs still have failed to create a genuine dispute of material fact.

**9.** Sales representatives assigned a territory could receive credit for "direct sales" and "indirect sales." Slaby Decl. (dkt. 145–1) ¶ 23. "Direct sales" are made by HP directly to a customer. *Id.* "Indirect sales" are sales of HP products by "partners" or "resellers" that sell HP products. *Id.* Some partners and resellers were "reporting" and some were

"non-reporting." *Id.;* Wesoky Decl. (dkt. 191) Ex. 31. Reporting partners and resellers provided sales data directly to HP; non-reporting partners and resellers did not. *Id.* To receive credit for a non-reporting partner's or reseller's sale, a sales representative was required to submit a manual claim form. Wesoky Decl. (dkt. 191) Ex. 31.

**10.** HP paid draws from the beginning of a fiscal cycle until sales representatives' Sales Letters were issued. Slaby Decl. (dkt. 145–1) ¶ 36. The Sales Letters "contained the quota, customer/territory assignments, performance metrics, and performance period." *Id.* ¶ 16. Without the Sales Letter, HP could not determine incentive pay, so the draw process was used to approximate incentive pay and even out employees' compensation.

earned unless a sales representative reached his applicable quota. *Id.* Exs. 18; *see also* Slaby Decl. (dkt. 145–1) ¶¶ 13, 21. Whether a sales representative met his quota could not be determined until the close of his performance period, usually semi-annually or annually. Ex. 4 to Slaby Decl. (dkt. 145–2) HP 550 Sec. 4.1 ("Incentive pay is calculated with period-to-date calculation. The actual performance attainment percentage is determined by dividing the cumulative period-to-date sales by the quota that applies to the entire measure period."). HP told sales representatives with quotas that "[p]ay advances are considered liabilities and are subject to recovery by HP . . . . The 'performance level threshold' is the stated performance level threshold the sales employee must meet prior to earning the incentive pay that was issued as a pay advance." Ex. 15 to Slaby Decl. (dkt. 145–2) HP219242. Further, HP made clear that "the sales employee must meet [the performance level threshold] prior to *earning* the incentive pay that was issued as a pay advance." *Id.*

### 2. Omega's Role In HP's Incentive Pay System

Omega is HP's incentive pay calculation system. Slaby Decl. (dkt. 145–1) ¶ 43. It receives data from various sources. *Id.* As discussed above, in the Third Amended Complaint and in Opposition to Motions to Dismiss, Plaintiffs asserted that a flaw in Omega caused HP to underpay its employees and/or to pay them late. *See, e.g.,* Third Am. Compl. (dkt. 69) ¶ 3 ("[T]he Employees . . . seek to enjoin HP from continuing to use the malfunctioning Omega system . . . .").

Plaintiffs now assert that the flaw was not with Omega itself—which is now characterized as a "glorified calculator"—but rather with "HP's entire complex compensation system, commonly referred to as Omega[, which] contained multiple, sys-temic flaws that frustrated any efforts to pay [sales representatives] timely and accurately. Succinctly stated, it was a giant trash compactor in which garbage went in and garbage came out." Reply in Supp. of Mot. to Amend (dkt. 224) at 1 n. 1; Opp'n to Mot. for Summ. J. at i.

### 3. General Evidence Of Problems With HP's Incentive Pay System

Plaintiffs set forth evidence that HP experienced broad based problems in timely and accurately paying its sales force.

For example, Plaintiffs point to an internal HP audit that, following a sampling of 25 employees, found that representatives were underpaid approximately a quarter million dollars over a three month period because HP was late in getting out Sales Letters. Wesoky Decl. Exs. 7–8 at HP382963–64, HP382953–54; *see also* Ex. 25–26 (describing delays in issuance of Sales Letters within a particular section of HP); Ex. 27 (August 2009 email describing "overall delays worldwide with variable pay and opening Omega reporting . . . .").

Further, reporting customers did not always provide information to HP timely, accurately, or at all, resulting in late, inaccurate, or entirely missed incentive pay. *Id.* Ex. 32 (Pruss Depo.) 25:16–25 ("Our resellers . . . did not always give us accurate data, and that data would need to be updated occasionally, and there was a process for all of that. And the internal data from internal HP systems seemed to be accurate most of the time; in other words, I can't think of a situation where that data was ever a problem for [the Compensation group that I managed.]"). For example, in late 2008 Yahoo purchased just under $1 million worth of HP goods from a reseller, but delays in receipt of the information necessary to process the claim resulted in HP rejecting credit for the sale. *Id.* Ex. 34 at HP379943–44.

Similarly, there were issues in the summer of 2007 with properly crediting sales, and a significant sum of money was backlogged in HP's system. *Id.* Ex. 38 (Sept. 21, 2007 email) at HP21419 ("There have been major issues in the U.S. Sales Comp environment: Missing Data—delays in receiving $1.7 Billion data from an upstream system (Vista) which is used to determine pay. Reporting Unavailability—Sales Reps have had access to their reporting environment 4 from 14 workdays in September and 12 from 23 in August[.] This has led to high dissatisfaction amongst Sales Reps because they do not get timely visibility of where they are against Quota or get accurate pay in a reasonable timeframe."). Indeed, 2007 appears to have been a particularly problematic year for HP in terms incentive pay. *Id.* Ex. 40 (Power Point Presentation) at HP4075 ("The aging environment of the IT applications and infrastructure that support Sales Compensation, combined with reductions in IT headcount and their focus on the IT transformation has resulted in a series of IT events throughout FY07 that have impacted timely and accurate compensation to the U.S. Sales Force.") and HP4077 ("Late & Inaccurate payments to sales force [ ] is # 1 sales productivity issue and stated cause for attritions [sic] & ability to attract sales talent."); Ex. 42 (Sept. 11, 2007 Sales Compensation OMEGA Update) at HP4463 ("All U.S. sales reps are affected by poor OMEGA and OOL stability and availability."). HP was still suffering similar issues, at least within pockets of the sales force, well into 2009. *Id.* Exs. 39, 54–55, 58–62.

#### 4. California Plaintiff James Purvis

Purvis was employed by HP starting on April 30, 2007. Thiel Decl. (dkt. 146–1) ¶ 11. He earned a guaranteed annual base salary and was eligible for additional compensation based on commission sales. *Id.* Purvis was subject to a 60% quota, which meant that he would not be entitled to any incentive pay if he did not hit 60% of his target. Thiel Decl. (dkt. 146–2) Ex. 4; Purvis Depo. (dkt. 184–1) 234, 236 ("[I]f you didn't exceed 60 percent attainment [ ] you would not be paid any commission."). It is undisputed that Purvis did not attain 60% of his target. Purvis Depo. at 255:11 ("Mark Hurd, himself, wouldn't have been able to hit this quota."). Thus, it is undisputed that, based on the information HP put into Omega, Purvis did not earn any incentive pay.

#### 5. Colorado Plaintiff Jeffrey Johnson

Johnson was employed as an Inside Sales Representative from February 18, 2005 through August 1, 2008. Thiel Decl. (dkt. 146–1) ¶ 26. He was paid an annual salary and was eligible for incentive compensation. *Id.* He was assigned to the State, Local, and Education sales team ("SLED") or a sub-group within that team. *Id.* ¶ 28. Starting in 2007 and continuing to the end of his employment, Johnson was covered by HP's 60% performance threshold. Slaby Decl. (dkt. 145–1) ¶ 32. Under his sales plans, Johnson was entitled to be credited for direct and indirect volume sales to colleges and universities in his assigned territory. Thiel Decl. (dkt. 146–1) ¶ 29. If the sale was made by a non-reporting reseller, Johnson had to file a manual claim to receive sales credit. *Id.*

#### 6. Colorado Plaintiff Shaun Simmons

Simmons worked as a sales representative from December 2002 to October 2008. *Id.* ¶ 34. From 2005 through the time he stopped working at HP, he was in HP's Technology Solutions Alliance Group.[11]

---

11. Simmons's employment prior to FY2005 is not relevant because of the applicable statute of limitations.

McClurg Decl. (dkt. 144–6) ¶ 1. He received a base salary and was eligible for incentive compensation. Thiel Decl. (dkt. 146–1) ¶ 34.

In FY2005–FY2006, Simmons was assigned to sales of specific HP product lines to IBM. McClurg Decl. (dkt. 144–6) ¶¶ 5–6; Thiel Decl. (146–1) ¶¶ 36–37. In FY2006, he was also responsible for sales of certain products to Unisys and Data Return. In FY2007,[12] he switched to a different type of compensation plan that required that he meet certain objectives set by his manager. McClurg Decl. (dkt. 144–6) ¶ 9; Thiel Decl. (dkt. 146–1) ¶ 38. In FY2008, Simmons's compensation plan changed again, and his performance was based on two metrics—(1) revenue generated from "sell-to" business (sales directly from HP to certain companies) and (2) "leverage" business (sales by other companies of HP products). McClurg Decl. (dkt. 144–6) ¶ 4; Thiel Decl. (dkt. 146–1) ¶ 39.

### 7. Colorado Plaintiff Jennifer Riese

Riese was an Inside Sales Representative in the Personal Systems Group from March 27, 2002 to February 27, 2009. Thiel Decl. (dkt. 146–1) ¶ 18. She was paid an annual salary and was eligible for incentive compensation. *Id.*

In FY2005, Riese was responsible for selling personal related systems to small and medium sized businesses.[13] *Id.* ¶ 22. In FY2006, she was assigned to SLED and was responsible for selling volume products to colleges and universities in a defined region in the Southwest and Hawaii. *Id.* In the second half of FY2007, Riese moved to the Agent Group in the Solutions

Partner Organization, where she remained until she left HP.[14] Cannon Decl. (dkt. 144–1) ¶ 1. At that point, her incentive pay became "team based," and she and her group were paid incentive compensation based on sales of products that were "influenced" by their assigned partners in certain regions. *Id.* ¶¶ 2, 9.

### B. Legal Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A principal purpose of the summary judgment procedure is to isolate and dispose of factually unsupported claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden is on the moving party to demonstrate that there is no genuine dispute with respect to any material fact and that it is entitled to judgment as a matter of law. *Id.* at 323, 106 S.Ct. 2548. A genuine issue of fact is one that could reasonably be resolved in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is "material" only if it could affect the outcome of the suit under the governing law. *Id.* at 248–49, 106 S.Ct. 2505.

If the moving party does not satisfy its initial burden, the nonmoving party has no obligation to produce anything, and summary judgment must be denied. *Nissan*

---

**12.** Starting in 2007 and continuing to the end of his employment, Johnson was covered by HP's 60% performance threshold. Slaby Decl. (dkt. 145–1) ¶ 32.

**13.** Riese's employment prior to FY2005 is not relevant because of the applicable statute of limitations.

**14.** Starting in 2007 and continuing to the end of her employment, Riese was covered by HP's 60% performance threshold. Slaby Decl. (dkt. 145–1) ¶ 32.

*Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir.2000). If, on the other hand, the moving party has satisfied its initial burden of production, then the nonmoving party may not rest upon mere allegations or denials of the adverse party's evidence but instead must produce admissible evidence that shows that there is a genuine issue of material fact for trial. *Id.* at 1103. The nonmoving party must "set out 'specific facts showing a genuine issue for trial.'" *Celotex*, 477 U.S. at 324–25, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c)). If the nonmoving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Id.* at 323, 106 S.Ct. 2548.

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. However, it is not a court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.1996) (internal quotations omitted). Rather, a court is entitled to rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment. *See id.* Further, a "scintilla of evidence" is insufficient to support a non-moving party's position: "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Accordingly, this Court applies essentially

the same standard as on a motion for directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. When one party tells a story that blatantly disregards the record, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Mere disagreement or a bald assertion that a genuine issue of material fact exists will not preclude summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir.1989).

## C. Discussion

### 1. HP Is Entitled To Summary Judgment On Plaintiffs' Breach of Contract Claims

■ To survive summary judgment on a breach of contract claim, Plaintiffs must (1) establish the existence of a contract; (2) show that they performed; (3) show that HP failed to perform; and (4) show that they were damaged. *Reichert v. Gen. Ins. Co. of Am.*, 68 Cal.2d 822, 830, 69 Cal.Rptr. 321, 442 P.2d 377 (1968); *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo.1992).[15] The parties agree that a contract exists, so the question is whether Plaintiffs (or any one or more of them) have enough evidence to establish triable issue(s) as to breach and damage.

---

**15.** California's choice-of-law rules apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under those rules, Colorado law applies to Colorado Plaintiffs' contract claims. Cal. Civ.Code § 1646. Plaintiffs argue that California law (with its longer statute of limitations) applies because there is no difference between the substantive law of California and Colorado as to how to establish breach of contract. Consol. Opp'n to Mots. for Summ.

J. at 8. Plaintiffs are incorrect. Section 1646 provides that "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." Cal. Civ. Cod. § 1646. For the Colorado Plaintiffs, the relevant "place" of performance and/or creation is Colorado. Thus, Colorado law applies to the Colorado Plaintiffs' breach of contract claims.

### a. Plaintiffs Lack Sufficient Evidence To Create A Triable Issue As To Whether They Were Underpaid In Breach of Contract

■ Plaintiffs rely extensively on general evidence of problems in HP's incentive pay system to support their claims of breach of contract. *See generally* Opp'n to Mot. for Summ. J. at 10–12; Consol. Opp'n to Mots. for Summ. J. at 14–15. The rhetorical power of that evidence notwithstanding, it is insufficient to create a triable issue of fact as to whether HP breached its contract with Plaintiffs (or any one or more of them) by not paying incentive pay that they were owed. This is because Plaintiffs do not link HP's problems with actual failure to pay them what they were owed under their sales contracts.

*California Plaintiff Purvis.* Purvis never achieved his 60% quota and, thus, never earned any incentive pay. Purvis Depo. at 255:11. Therefore, the only way he can show an underpayment in breach of contract is if he has evidence that he did not receive credit for sales he should have been credited for and that, if credit had been properly applied, he would have met his quota. Purvis lacks this evidence. Purvis Rogs., Resp. No. 2 (dkt. 142–4) (cannot "identify specific compensation payments that were denied"); *see also* Purvis Depo. (dkt. 184–1) 197:20–199:6; 203:4–18; 205:19–206:19; 215:11–216:17.

The closest Purvis comes to evidence supporting his claim that he was not paid incentive pay that he was owed is his personal estimate, "based on his memory and recollection, that he suffered a reduction in the commission to which he was entitled that was in the neighborhood of ten percent due to the Omega system's errors," Wesoky Decl. (dkt. 191) Ex. 95 (Interrogatory Resp. No. 9). This is insufficient to create a genuine issue of fact as to whether HP failed to pay Purvis incentive pay that he was owed. It is wholly conclusory, contradicts admissions he made during his deposition, appears to be based on an HP reconciliation for a group that Purvis had no relationship with, and does not show that Purvis would have met his quota if credit had been properly applied. *Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266 (9th Cir.1991) ("[T]he general rule ... is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."); *see also* Morton Decl. (dkt. 144–8) ¶¶ 2–6 ("The DesignJet Business in which I work is a small, unique segment of HP's Graphics Solutions Business ........ The DesignJet Business employs fewer than 30 sales representatives and sales managers in the United States..... [A 2009] reconciliation [for the first half of FY 2009] revealed that the quota had been set too high.... For the first half of fiscal year 2009, I calculated that an 'uplift' of 10% was appropriate to permit the credited shipment data to accurately correspond to the quotas as set. .... We have subsequently calculated and applied similar uplifts—ranging from 1% to 16%—for the second half of fiscal year 2009, and first half of fiscal year 2010. .... *None of [the Plaintiffs] was a sales representative within the DesignJet business.")* (emphasis added).

Purvis also says that one of his team members was tasked with submitting manual claims for the team so that they would be credited properly for sales requiring manual claim submission. Wesoky Decl. (dkt. 191) Ex. 95 (Interrogatory Resp. No. 9). Accepting that as true, it does not show that HP failed to credit properly submitted manual claims or that, if it did, proper crediting would have pushed Purvis across the 60% threshold.

Purvis also relies on deposition testimony from John Rhodes and Shawn Manley to support his contention that he was not

credited properly for sales. But the cited testimony does not help him.

Rhodes admitted that he does not know what Purvis was credited for.

**Q. Can you identify a transaction that you know that James Purvis was supposed to have been credited for, but was not?**

**A. I specifically couldn't, because I didn't worry about James Purvis. I** worried about John Rhodes and what I was selling. But I did see one, going through the emails with Epicore [phonetic] software, and he was arguing about that. And I did see that e-mail. So yeah, that's one I can tell you.

**Q.** Do you recall anything about the—what he was saying about Epicore software?

**A.** I never talked about it. I just happened to see an email in there that he brought up.

**Q. And so you don't know if he eventually was credited for that?**

**A. Nope.**

Rhodes Depo. (dkt. 202–1) 39:15–40:9 (emphasis added).

Manley did provide a spreadsheet that he claims shows that certain sales were not credited to Purvis (among others). Manley Depo. (dkt. 202–2) 102:18–104:11; 106:20–107:6. However, neither Manley's generalized assertions regarding crediting problems, nor the spreadsheets themselves (even assuming the spreadsheets are admissible), explain how HP breached its contract with Purvis. For example, all but a few of the amounts in the spreadsheet fall below the minimum threshold for manual claims. *Id.* Further, sales requiring submission of a manual claim form are not identified, nor does the spreadsheet say whether, if a manual claim form was required, one was properly filled out and

filed. Additionally, the spreadsheet does not show that Purvis would have met his performance threshold.

*Colorado Plaintiff Johnson.* Johnson does not have sufficient evidence to create a triable issue as to whether HP breached its contract by underpaying him. Johnson notes that HP has "admit[ed that] Johnson identified sales to Hackensack Medical Center for which he did not receive credit." Consol. Opp'n to Mots. for Summ. J. at 13. Although true, it is undisputed that that sale fell below HP's minimum threshold for manual claims. Slaby Reply Decl. (dkt. 217–4) ¶ 5.

Johnson argues that there is a dispute of fact as to whether the minimum threshold is a part of Plaintiffs' contracts because (1) an HP audit found that not all claims below the minimum threshold were rejected and (2) HP told employees that there was no minimum threshold. Consol. Opp'n to Mots. for Summ. J. at 13; Wesoky Decl. (dkt. 191) Ex. 85–86. Even assuming that Johnson's evidence is admissible, it does not create a jury question as to whether the minimum threshold was a part of Plaintiffs' contracts. First, Plaintiffs acknowledged that the minimum threshold was a part of their contracts in the Third Amended Complaint and during discovery. Third Am. Compl. (dkt. 69) ¶ 33 ("During the time period at issue in this lawsuit, sales representatives could not submit an invoice manually unless the sale met a certain threshold amount. . . ."); Johnson Resp. to Interrogatory 16 ("HP's policy that no manual claim could be submitted unless it met a certain dollar threshold, e.g., $10,000[,] resulted in Plaintiff being paid less than earned."). Second, the fact that an HP audit showed that HP paid some manual claims below the threshold does not show that HP waived the minimum threshold requirement for all sales representatives.[16]

---

**16.** Johnson relies on an email string to try to show that HP told employees that there was

no minimum threshold. But this email string does not involve him, was sent after he left

Finally, Johnson's personal estimate that he was underpaid "approximately 5% of his annual commissions" does not create a genuine issue of fact as to whether HP underpaid him in breach of contract. Like Purvis, Johnson has no evidence of any instance in which he was not credited properly. The 5% figure is entirely unsubstantiated as to Johnson and is akin to simply asserting that a genuine dispute of facts exists, which is insufficient.[17] *See Scott*, 550 U.S. at 380, 127 S.Ct. 1769.

*Colorado Plaintiff Simmons.* Simmons also lacks sufficient evidence to create a triable issue of fact as to whether HP failed to pay him everything he was owed. Prior to a Declaration submitted in opposition to HP's Motion for Summary Judgment, Simmons had not identified any improperly denied credit. Simmons Depo. (dkt. 142–3) 38:22–39:1 ("Q. [W]hen you were at HP, did you ever see a transaction that didn't show up on OMEGAonline at all? A. To the best of my recollection right now, I'm not able to ascertain yes or no."). In his Declaration submitted in opposition to summary judgment, however, Simmons asserts that "[i]n 2007, I was underpaid nearly $17,000 for my role as an 'influencer' on transactions with The Hartford. Instead of paying me the owed amount of over $17,000, HP only paid me $200." Simmons Decl. (dkt. 192–1) ¶ 6.

Simmons's Declaration does not create a genuine issue of material fact as to whether he was underpaid in breach of contract because (1) it is completely conclusory and amounts to a generalized assertion that a dispute exists; and (2) it contradicts earlier admissions that Simmons could not identify any missing credit and provides no explanation for the inconsistency. *Kennedy*, 952 F.2d at 266 ("[T]he general rule . . . is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.").

*Colorado Plaintiff Riese.* Riese is similar to her co-Plaintiffs in lacking evidence that HP failed to credit her properly for sales. For example, in her deposition Riese could not identify instances in which she was improperly denied bonuses she was owed. Riese Depo. (dkt. 142–3) 186:6–9 ("Q. Do you believe that there were bonuses that you should been paid that you were not paid? A. There might be. Again, without having HP's—allowing me to see the data, possibly.").

In her Declaration submitted in opposition to HP's Motion for Summary Judgment, Riese says that "as documented in the attached string of emails, I was not paid for addition [sic] sales made through Ingram to Agilysis." Riese Decl. ¶ 5, Ex. 1. But the email string does not show that Riese was not paid for the Ingram/Agily-

HP, and appears to relate to a division he never worked in. *See* Wesoky Decl. (dkt. 191) Ex. 86.

**17.** Johnson also cites the deposition testimony of Bridget Praytor to support his claim that he was underpaid. But her testimony (which is likely inadmissible hearsay) is as unhelpful as Johnson's in identifying actual sales for which Johnson should have received credit but did not.

Q. Do you have any knowledge whether Jeffrey Johnson experienced any problems with incentive compensation while he was employed with HP?
A. Yes. I heard about it on a daily basis.

Q. What did he tell you?
A. Him, as well as every other sales rep I worked for, said on a regular basis that they weren't being paid properly.
**Q. Did he tell you anything specific?**
**A. No.**
Q. Do you know if Jeffrey Johnson ever filed a manual claim?
A. No. I don't know.
**Q. Do you know any specific sale that Jeffrey Johnson should have been credited for but was not?**
**A. No. I don't know.**
Praytor Depo. (dkt. 202–3) 57:3–22 (emphasis added).

sys sales. Rather, it shows that she was involved in discussions about whether she was going to receive credit. That credit was ultimately given. *See* Cannon Reply Decl. (dkt. 217–12) ¶ 5 ("I approved the Post–Agent Addition requesting payment for Invoice Number 41723898 and submitted it to the Program Office such that the order could be linked to Riese and the Central Agent team to which she was assigned."), Exs. 1–2. There is no evidence, other than Riese's conclusory statement and the email string that does not support it, that HP failed to credit Riese properly for the Agilysys/Ingram sales.

\* \* \*

Plaintiffs make two primary arguments as to why the foregoing recitation of the state of the record does not entitle HP to summary judgment on the claim that HP breached its contract by underpaying them.

First, Plaintiffs argue that they need only show the fact of damage rather than the amount of damage and that they have satisfied their burden via the general evidence of problems in HP's incentive pay system. Opp'n to Mot. for Summ. J. at 13–14 (citations omitted). This argument is not persuasive because the general evidence does not establish even the fact of damage as to these Plaintiffs. To the contrary, as discussed above, Plaintiffs have not set forth sufficient evidence to create a triable issue as to whether any one of them was not properly credited for sales. They also have not connected any failure to pay

them (assuming such failure occurred) with an Omega malfunction or a contractual breach.

Second, Plaintiffs attempt to shift the blame for their failure to have sufficient evidence to HP. They do so by asserting that HP has refused to provide them the data necessary to conduct the analysis that would show that HP failed to credit them properly. Opp'n to Mot. for Summ. J. at 13 ("Purvis has not been able to more specifically identify other sales for which he should have received, but did not receive, [credit] because HP refuses to provide the requested information."); Consol. Opp'n to Mots. for Summ. J. at 24 ("Plaintiffs have not been able to more specifically identify other sales for which they should have received, but did not receive, [credit] because HP refuses to provide the requested information"); See Fed.R.Civ.P. 56(f). Plaintiffs want to take additional discovery to obtain this "raw data" to augment the record. Consol. Opp'n to Mots. for Summ. J. at 24–25.

Plaintiffs' argument is not persuasive because the reason they do not have the raw data is that HP's discovery responses have been shaped by Magistrate Judge Zimmerman's and Special Master Warren's rulings interpreting the scope of the operative Third Amended Complaint. (Rulings with which this Court is in full agreement.) Specifically, because those rulings construed the Third Amended Complaint as alleging Omega malfunctions, HP has for the most avoided having to turn over raw data regarding input into Omega.[18] Thus, whether Plaintiffs are en-

---

**18.** After HP's Summary Judgment Motions and Plaintiffs' Motion to Amend were filed, Judge Warren ordered HP to turn over "raw sales and delivery information" "that Plaintiffs can use to prove that they were not properly credited for sales...." DMO 10 (dkt. 210) at 1–2. Specifically, Judge Warren ruled that:

[a]lthough the efficacy of the following statement may turn on the Court's ruling on

*Plaintiffs' pending Motion to Amend,* Plaintiffs argue that their case will ultimately be that they haven't been properly paid because, at least in part, the raw data fed into the computers was fed late (or was otherwise untimely), was wrong or, in some cases, wasn't fed into them at all. They want production of the raw data itself so that they can run the relevant calculations using their own experts. This information is relevant and discoverable.

titled to the raw data folds back into the question whether Plaintiffs should be granted leave to amend. As discussed above, leave to amend will not be granted. Accordingly, the Court will not defer ruling on HP's Summary Judgment Motions to allow Plaintiffs to take discovery that, in the Court's view, is outside the scope of the operative Complaint. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1291–92 (9th Cir.2000) (theories of liability must be alleged in the complaint because it "guides the partes' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations.").

### b. Plaintiffs Lack Sufficient Evidence To Create A Triable Issue As To Whether They Were Paid Late In Breach Of Contract

■ In addition to arguing that they were underpaid, Plaintiffs also argue that they were paid late.[19] Specifically, Plaintiffs assert that they were entitled to credit for sales upon "shipment" and that incentive pay was therefore "earned," at the latest, upon shipment. Opp'n to Mot. for Summ. J. at 14–17; Consol. Opp'n to Mots. for Summ. J. at 15–18. On that theory, earned incentive pay was paid late because

payment occurred well after shipment in many cases.

Plaintiffs' argument relies primarily on language from HP's "Global Sales Compensation Policy." In a section entitled Sales Credit Eligibility Notes, it provides that "[g]enerally, sales credit for hardware and software products is provided based on ship date." Wesoky Decl. (dkt. 191) Ex. 23 at HP831. The very next sentence in the Global Sales Compensation Policy says that "[a]lternatively, sales credit may be based on revenue date, invoice date or HP-reported margin in some business models *and/or based on performance measures identified in the employee's Sales Plan." Id.* (emphasis added). Plaintiffs' contracts also provided for performance periods affecting when/whether incentive pay was earned and, after the 60% quota was put in place, Plaintiffs were not entitled to *any* incentive pay if they failed to meet their quota. Slaby Decl. (dkt. 145–2) Exs. 3–5. Therefore, even assuming that Plaintiffs were entitled to "credit" for a sale upon shipment, that credit did not translate into "earned" incentive pay until Plaintiffs' performance period was over.[20] *See, e.g., Nein v. HostPro, Inc.*, 174 Cal.App.4th 833, 853, 95 Cal.Rptr.3d 34 (2009) ("[F]or purposes of enforcing the

---

*Id.* at 2 (emphasis added). The Court agrees with Judge Warren that the propriety of his ruling in DMO 10 turns on this Court's disposition of Plaintiffs' Motion to Amend, which the Court has denied.

**19.** None of the Colorado Plaintiffs alleged in the Complaint that they were paid late in breach of contract. That alone is reason enough to grant HP summary judgment on that theory. *See Coleman*, 232 F.3d at 1291–92. However, the Court assumes for the sake of argument that the issue of late payments is part of the Third Amendment Complaint for all Plaintiffs.

**20.** Plaintiffs argue that the foregoing analysis violates California law because "[a] commis-

sion is earned ... when all of the *legal* conditions precedent have been met." Opp'n to Mot. for Summ. J. at 15–16; Consol. Opp'n to Mots. for Summ. J. at 16–17 (citing Division of Labor Standards Enforcement Policies and Interpretations Manual). First, California law applies only to Purvis. Second, even if the Division of Labor Standards interpretation had the force of law, it merely establishes that Purvis did not earn incentive pay until after all the legal preconditions in his contract were met. Among those legal preconditions was the requirement that he meet his quota. The determination whether he met his quota could not be made until the end of his performance period. Thus, Purvis could not have "earned" incentive pay until, at the earliest, the end of the performance period.

provisions of the Labor Code, '[t]he right of a salesperson or any other person to a commission depends on the terms of the contract for compensation'") (citations omitted).

▇ Plaintiffs also lack any evidence of incentive payments paid "late" in breach of contract. Purvis admits that he has no such evidence. Purvis Depo. (dkt. 184–1) at 173:3–11. Johnson says that he recalls two specific transactions where commissions were delayed for approximately three months. Johnson Decl. (dkt. 192) ¶ 5. However, he provides no accompanying facts regarding these transactions nor does he identify any particular contractual provision these "delayed" incentive payments violated. Similarly, Simmons's Declaration asserts that he sold $12 million worth of products to GMAC in 2007, and his commission was delayed 8 months. Simmons Decl. (dkt. 192–1) ¶ 4. HP has submitted un-controverted evidence that the crediting process for sales of the type described by Simmons takes as long as five months and that Simmons was paid for the credited sales well within that time frame. *See* McClurg Reply Decl. (dkt. 217–3) ¶ 7–10. Finally, Riese also lacks evidence that she was paid late. Riese Depo. (dkt. 142–3) 34:20–25 ("Q. And did your understanding of the deal have a time limit for when you would be paid? A. No. We got paid our base and any commission . . . ."); 35:10–21 (similar). Notwithstanding her deposition testimony, Riese asserts in her Declaration that she was paid late for Agilysys influenced transactions. Riese Decl. There is no factual context for this assertion or explanation of how it breaches Riese's contract. In addition,

Riese argues in the Consolidated Opposition (but does not say in her Declaration) that her incentive pay was delayed three months in FY2007 because she was mistakenly assigned to the wrong sales plan. Consol. Opp'n to Mots. for Summ. J. at 14. HP has submitted un-controverted evidence that the error was corrected while Riese was still receiving draw payments (which she would have received regardless of which sales plan she was on) and that the error "had no impact on Riese's incentive payments." Slaby Reply Decl. (dkt. 217–4) ¶ 6.

Thus, HP is entitled to summary judgment on the breach of contract claim to the extent based on alleged late payments because Plaintiffs offer nothing other than wholly conclusory, unsupported Declarations [21] insufficient to allow a jury to rule in their favor.

\* \* \*

As they did with respect to their theory that they were not paid all they were owed, Plaintiffs attempt to get around the lack of evidence of late payment by arguing that they need not show that they were personally paid late because they have evidence that, as a general matter, incentive payments were delayed, delays were classwide, and delays resulted in Plaintiffs receiving "draws" rather than incentive pay. Opp'n to Mot. for Summ. J. at 12. None of that constitutes evidence that Plaintiffs were paid "late" in breach of contract. Even granting that Plaintiffs have evidence that they received "draws" rather than incentive pay during the time period between the beginning of a fiscal year and when Sales Letters were issued, they have

---

**21.** Simmons and Riese were each issued checks by HP after their employment concluded. Consol. Opp'n to Mots. for Summ. J. at 14. This does not create a triable issue on late payments for three primary reasons. First, Simmons and Riese each received what they were owed (approximate $300 and $600

respectively) plus interest. Second, and perhaps more critically, neither Simmons nor Riese connect these "late" payments to any Omega malfunction or breach of any contractual provision. Third, neither Simmons nor Riese even alleged in the operative Complaint that late payments caused a breach.

not shown how the payment of draws harmed them. Purvis never earned incentive pay, and no other Plaintiff has shown that s/he received less in draws than what s/he would have received in incentive payments or that HP failed to "reconcile" incentive pay with the draw payments after Sales Letters were issued. *See generally* Slaby Decl. (dkt. 145–2) Ex. 3. Further, Plaintiffs' contracts authorized the payment of draws. *See* Wesoky Decl. (dkt. 191) Ex. 18 at HP70623–24.

### c. Plaintiffs Lack Evidence That HP Breached The Implied Covenant Of Good Faith And Fair Dealing

 "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Carma Dev. (Cal.), Inc. v. Marathon Dev. Cal., Inc.,* 2 Cal.4th 342, 371, 6 Cal.Rptr.2d 467, 826 P.2d 710 (1992). The covenant applies "where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." *Id.* at 371–72, 6 Cal.Rptr.2d 467, 826 P.2d 710. In Colorado, "there is no cause of action for breach of implied covenant of good faith and fair dealing in employment situations[.]" *Marsh v. Delta Air Lines,* 952 F.Supp. 1458, 1464 (D.Colo.1997). Thus, California Plaintiff Purvis is the only Plaintiff with a possible claim based on breach of the covenant of good faith and fair dealing.[22]

 Purvis claims that he had "a right to be paid commissions on all direct and indirect sales of identified HP products within a specific territory (or to specified customer)" pursuant to his contract with HP. Opp'n to Mot. for Summ. J. at 19. He further asserts that HP breached this right by (1) imposing an unduly onerous manual claims process which, as a practical

matter, was impossible to comply with; (2) delaying issuance of quotas, causing draws to be paid rather than incentive payments; and (3) withholding hundreds of millions of dollars from the sales crediting process.

Purvis has no evidence that HP underpaid him or paid him late as a result of the manual claims process, any delay in issuing quotas, or the withholding of money from the crediting process. As discussed above, Purvis has not identified underpayments or late payments, let alone any caused by the manual claims process, any delay in issuing Sales Letters (causing draws to be paid), or any failure to submit proper crediting information to Omega. Nor, on a more fundamental level, has Purvis shown how a rational jury could rule in his favor on the implied covenant theory.

First, the manual claims process is a part of Purvis's contract with HP. Third Am. Compl. (dkt. 69) ¶ 33 ("During the time period at issue in this lawsuit, sales representatives could not submit an invoice manually unless the sale met a certain threshold amount."); Slaby Decl.(dkt. 145–2, 3) Ex. 7 at HP312 ("Credit for indirect business through a non-reporting partner would need to be submitted and approved via a manual claim . . . ."), Ex. 8 at HP885 ("All criteria of the [manual] claim must be met prior to submission. Standard criteria applicable to all claims are as follows: quota deployment, documented sales effort, shipment/invoice/order validation, supporting documentation, and required approvals. Minimum thresholds (which apply to U.S. claims only) are per order/invoice and there is no bundling of orders to meet thresholds."), Ex. 9 at HP900 (same). Moreover, there is insufficient evidence that HP exercised contrac-

---

**22.** Assuming, *arguendo,* that Colorado law recognizes Colorado Plaintiffs' implied cove-

nant theory, the following analysis applies to them as well.

.

tual discretion to make the manual claims process unreasonably burdensome.

Second, payment of draws pending issuance of Sales Letters was also a part of Plaintiffs' contracts. *See, e.g.,* Slaby Decl.(dkt. 145–2) Ex. 4 at HP549 ("Sales Letters will be issued to all sales employees as early as possible in the measure period."); Slaby Decl. (dkt. 145–1) ¶ 36 (citing policy language providing for payment of draws). Even assuming Plaintiffs have shown that draws were paid for longer periods than anticipated by HP's sales representatives (and HP itself), they have not produced evidence to allow a jury to conclude that those delays (1) caused them harm (i.e. that draw payments were less than what their incentive payments would have been and that any difference was not corrected once Sales Letters were issued) or (2) resulted from HP's bad faith discretionary decisions. Likewise, Plaintiffs lack evidence from which a jury could rationally conclude that HP's "suspense process"—in which certain transactions were not promptly forwarded to Omega—breached HP's good faith obligations. HP has a provided a seemingly plausible explanation for why the "suspense process" occurred, see Reply (dkt. 216) at 31–33, but even if it had not done so, Plaintiffs have insufficient evidence to show that the suspense process was a discretionary act done in bad faith or that they were harmed by it.

**2. The Promissory Estoppel And Unjust Enrichment Claims Are Not Viable Because A Contract Exists**

Plaintiffs have acknowledged that, because "HP has admitted that it had contracts with Purvis[, t]he existence of contracts precludes claims for promissory estoppel and unjust enrichment." Opp'n to Mot. for Summ. J. at 21 n. 8. Accordingly, HP is entitled to summary judg-

ment on Plaintiffs' promissory estoppel and unjust enrichment claims.

**3. California Labor Code Claims: §§ 223, 218, 204, 226, 2926–2927, 201–203, And 2698 *et seq.***

■ California Plaintiff Purvis also brings several claims under the California Labor Code. HP argues that (1) none of the Labor Code sections create a private right of action;[23] and (2) even if there is a private right of action, Purvis lacks evidence sufficient to create a genuine issue of material fact as to whether HP violated any section of the Labor Code. HP is entitled to summary judgment on Purvis's California Labor Code claims for the reasons that follow.

*Sections 201–203.* These sections provide for the timely payment of wages upon discharge. On their face, they appear to contemplate a private right of action. Cal. Labor Code § 203(a)-(b) ("If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.3, 201.5, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty . . . . [and s]uit may be filed for these penalties at any time before the expiration of the statute of limitations on an action for the wages from which the penalties arise."). Thus, the Court assumes *arguendo* that sections 201–203 permit private rights of action to recover unpaid wages as a penalty. *See Kamar v. RadioShack Corp.,* No. CV 07–2252 AHM (AJWx), 2008 WL 2229166, at *2 n. 3 (C.D.Cal. May 15, 2008) ("RadioShack does not dispute that a private right of action exists to bring claims for unpaid wages and overtime and failure to timely pay wages upon discharge, pursuant to

---

**23.** As a general matter, a private right of action exists if the statute, in "clear understandable, unmistakable terms," indicates an intent to create such a right. *Vikco Ins. Serv. Inc. v. Ohio Indem. Co.,* 70 Cal.App.4th 55, 62–63, 82 Cal.Rptr.2d 442 (1999).

Labor Code sections 201, 202, and 203...").

■ Notwithstanding the existence of a private right of action, HP is entitled to summary judgement on Purvis's claims under sections 201–203 because he lacks evidence that HP did not pay him everything he was owed.

■ *Section 204.* Section 204 requires the payment of wages in a timely manner; it does not provide a right to wages. The remedy for violation of section 204 is found in section 210, which provides that "every person who fails to pay the wages of each employee as provided in Section 204 ... shall be subject to a civil penalty." Cal. Labor Code § 210. *See also Singer v. Becton, Dickinson and Co.,* No. 08cv821 IEG (BLM), 2008 WL 2899825 (S.D.Cal. July 25, 2008). Section 210 goes on to say that "[t]he penalty shall be recovered *by the Labor Commissioner* as part of a hearing held to recover unpaid wages and penalties pursuant to this chapter or in an independent civil action ... brought in the name of the people of the State of California and the Labor Commissioner and the attorneys thereof may proceed and act for and on behalf of the people in bringing these actions." (Emphasis added.) There is nothing in section 204 or 210 that indicates, in "clear understandable, unmistakable terms," that a private right of actions exists for violations of section 204. In any case, Purvis lacks evidence that HP failed to pay him or did not pay him timely.

*Section 218.* This section provides in relevant part that "[n]othing in this article shall limit the right of any wage claimant to sue directly or through an assignee for any wages or penalty due him under this article." This section creates a private right of action, at least for recovery of certain types of wages or penalties provided for under the Labor Code. *See* No. CV 07–2252 AHM (AJWx), 2008 WL 2229166, at *7 (C.D.Cal. May 15, 2008) ("Section 218

... clearly contemplates that wage claimants have a private right of action of some kind, but it is ambiguous as to what wages that private right of action encompasses."); *see also Guess v. U.S. Bancorp,* No. C 06–7535 JF (RS), 2007 WL 1345194, at *3 (N.D.Cal. May 8, 2007) (there is a private right of action under Labor Code Section 226.7 and "a number of California appellate decisions have cited § 218 for the proposition that wage claimants have a direct right of action to seek unpaid wages.") (citations omitted). Thus, although section 218 does not create a right to particular wages or penalties, it suggests the existence of a private right of action to enforce other sections of the Labor Code.

■ *Section 223.* Section 223 prohibits the secret payment of a lower wage while purporting to pay the wage required by statute or contract. The text of section 223 does not support the existence of a private right of action. Nor does section 223 create an entitlement to wages or specific penalties. Thus, section 223 does not create a private right of action, even in combination with section 218, because it does not set forth an entitlement to a wage or provide a penalty. In any case, Purvis has no evidence that HP "secretly" paid a lower wage "while purporting to pay the wage designated by ... [his] contract." Cal. Labor Code § 223.

*Section 226.* This section requires the furnishing by an employer to an employee of an "itemized statement" containing specified information about the employee's pay. Subparts (e)-(g) of this section suggest that a private right of action exists. Those subparts expressly provide for (1) specified damages recoverable by the employee, (2) penalties recoverable by the employee; and (3) "an action for injunctive relief to ensure compliance with this section...." Nevertheless, HP is entitled to summary judgment on Purvis's section 226

claim because he has not identified any pay statements that were not accurate. *See White v. Starbucks Corp.*, 497 F.Supp.2d 1080, 1089–90 (N.D.Cal.2007).

*Section 2926–27.* Section 2926 provides that "[a]n employee who is not employed for a specified term and who is dismissed by his employer is entitled to compensation for services rendered up to the time of such dismissal" and 2927 provides that "[a]n employee who is not employed for a specified term and who quits the service of his employer is entitled to compensation for services rendered up to the time of such quitting." These sections appear to provide a substantive right to wages, and even though the language of the statutes is not unmistakably clear, the Court assumes that a private right of action exists. Once again, however, HP is entitled to summary judgment. First, Purvis was not "dismissed by his employer," so section 2926 does not apply to him at all. Second, he has no evidence that HP failed to pay him "compensation for services rendered up to the time" he left, so HP is entitled to summary judgment on the section 2927 claim as well.

■ *Section 2698 et seq.* These sections, known as the Private Attorney General Act ("PAGA"), allow "an aggrieved employee on behalf of himself" to recover civil penalties due under "any provision of this code. . . ." Although it does not create a substantive right to wages, PAGA does provide a private right of action when a Labor Code section provides for a penalty. Here, sections 201–203 and 226, as discussed above, provide for penalties. Further, Labor Code Section 2699(f) provides "default" penalties for any section that does not already include one. Thus, suit is authorized under PAGA to recover these penalties if the plaintiff meets certain con-

ditions. That said, because HP is entitled to summary judgment on Purvis's Labor Code claims, it is also entitled to summary judgment on Purvis's PAGA penalties claim as well. *Elliot v. Spherion Pac. Work, LLC*, 572 F.Supp.2d 1169, 1180–81 (C.D.Cal.2008); *Price*, 2011 WL 16977, at *6.

### 4. Colorado Labor Code Claims: §§ 8–4–109, 8–4–103, 8–4–105

Colorado Plaintiffs have asserted claims under Colorado's wage and employment statutes. HP is entitled to summary judgment on these claims.

■ *Section 8–4–109.* Section 8–4–109(1)(b) provides that "[w]hen an employee quits or resigns such employee's employment, the wages or compensation shall become due and payable upon the next regular payday." Compensation must be earned and unpaid before section 8–4–109(1)(b) applies. *Lee v. Great Empire Bd., Inc.*, 794 P.2d 1032, 1034 (Colo.App. 1990) ("The wage statute applies only to those wages and compensation that are 'earned and unpaid' at the time of the employee's discharge.") (citation omitted).

■ A prerequisite to recovery under section 8–4–109 is making a written demand for unpaid wages within 60 days after employment ends. Colo.Rev.Stat. § 8–4–109(3)(a) & (d) ("If an employer refuses to pay wages or compensation in accordance with subsection (1) of this section, the employee or his or her designated agent shall make a written demand for the payment within sixty days after the date of separation and shall state in the demand where such payment can be received."). No such demands were made. Accordingly, HP is entitled to summary judgment on Colorado Plaintiffs' section 8–4–109 claims.[24]

---

24. As mentioned, Simmons and Riese were issued small checks after leaving HP, and the Court assumes for purposes of this discussion that such money was earned and unpaid when they left. Even so, Simmons and Riese

Plaintiffs argue that the absence of a written demand "does not affect Plaintiffs' right to reimbursement of wages, interest, and attorney fees." Consol. Opp'n to Mots. for Summ. J. at 23. In support, they cite to section 8–4–110 and *Fang v. Showa Entetsu Co.*, 91 P.3d 419 (Colo.App. 2003). Plaintiffs' argument is not persuasive.

First, *Fang* was decided under a different statutory scheme regarding attorneys' fees and is not relevant to this dispute. Second, the current scheme provides in pertinent part that "[i]f, in any [ ] action in which the employee seeks to recover any amount of wages or compensation, *the employee recovers a sum greater than the amount tendered by the employer,* the court may award the employee reasonable costs and attorney fees incurred in such action." Colo.Rev.Stat. § 8–4–110(1) (emphasis added). A written demand triggers the employer's opportunity to tender. Colo.Rev.Stat. § 8–4–109(3)(a.5) ("[I]f, *within fourteen days after the employee's demand,* the employer makes a legal tender of the amount that the employer in good faith believes is due, the employer shall not be liable for any penalty unless, in a legal action, the employee recovers a greater sum than the amount so tendered.") (emphasis added). The Court does not believe that the Colorado legislature intended for employees to recover attorneys' fees without first recovering more than the employer tendered in response to a demand. Such a system would

undermine the entire demand/tender framework, which incentivizes settlement by encouraging employer's to tender and employee's to accept by interlocking carrots and sticks related to recovery of attorneys' fees. *See* Michael J. Guyerson & Christian C. Onsager, *The Colorado Wage Act, Employee Status, and Terms of Compensation,* 35–May Colo. Law. 63, 66 (2007). Thus, the absence of a demand scuttles Plaintiffs' section 8–4–109.

*Section 8–4–103.* This section provides that "[a]ll wages or compensation, other than those mentioned in section 8–4–109, earned by any employee in any employment ... shall be due and payable for regular pay periods of no greater duration than one calendar month or thirty days, whichever is longer, and on regular paydays no later than ten days following the close of each pay period unless the employer and the employee shall mutually agree on any other alternative period of wage or salary payments."

 HP is entitled to summary judgment on Plaintiffs' section 8–4–103 claims for two primary reasons. First, section 8–4–103 does not provide penalties for late payments.[25] *See* 16 Colo. Prac. Employment Law & Prac. § 7.58 (2d ed. 2010) ("The penalty for refusing to pay wages applies only to compensation due former employees; current employees may not seek the statutory penalty for wages wrongfully withheld during their employment."). Second, Plaintiffs have no evidence that HP failed to pay them incentive pay timely after it was credited pursuant to their contracts.[26]

---

cannot create an issue of fact because it is undisputed that they did not make a demand.

25. It does provide for penalties "if, two or more times within any twenty-four-month period, the employer causes an employee's check ... to not be paid because the employer's bank does not honor an employee's check upon presentment." Colo.Rev.Stat. § 8–4–103(b). Plaintiffs do not allege that their checks were not honored.

26. As mentioned, Simmons and Riese were issued checks after they left HP. That does not support a section 8–4–103 claim because HP has already made them whole and section 8–4–103 does not provide penalties. Further, neither Simmons nor Riese have evidence that their "late" payments breached any contractual provisions as to when incentive pay was earned.

*Section 8–4–105.* This section governs when an employer may make payroll deductions. Other than asserting generally that they were not paid everything they were owed, Plaintiffs do not identify any wrongful "deductions" made by HP with respect to their incentive pay. Thus, HP is entitled to summary judgment on Plaintiffs' section 8–4–105 claims.[27]

### 5. HP Is Entitled To Summary Judgment On Plaintiffs' UCL Claim

Purvis argues in opposing HP's Motion for Summary Judgment as to his UCL claim that his UCL claim survives because he has valid claims under the Labor Code. Opp'n to Mot. Summ. J. at 24. To the contrary, none of Purvis's Labor Code claims has survived, and HP is therefore entitled to summary judgment on Purvis's UCL claim as well. *See Krantz v. BT Visual Images, LLC,* 89 Cal.App.4th 164, 178, 107 Cal.Rptr.2d 209 (2001).

### 6. HP Is Entitled To Summary Judgment On Plaintiffs' Claims For An Accounting

HP is also entitled to summary judgment on Plaintiffs' claims for an accounting. Plaintiffs have failed to show that they are owed any money by HP such that an accounting is proper to ascertain that unliquidated and un-ascertained liability. *See, e.g., Fintland v. Luxury Marine Group, LLC,* No. CV 09–4267 AHM (AGRx), 2010 WL 758543, at *7 (C.D.Cal. Mar.1, 2010); *Duggal v. G.E. Capital Comm. Serv., Inc.,* 81 Cal.App.4th 81, 95, 96 Cal.Rptr.2d 383 (2000); *Bradshaw v. Thompson,* 454 F.2d 75, 79 (6th Cir.1972).

### III. CONCLUSION

HP might have underpaid (and/or paid late) some its sales representatives. Plaintiffs, however, have failed to show that

they were underpaid (or paid late) in breach of their contracts. Similarly, they have not turned up any evidence of a "computer glitch" or system wide Omega malfunction causing uniform failure to credit sales representatives for everything they were entitled to. Nor is it appropriate to allow Plaintiffs to amend the Complaint and restart discovery to see if they can use HP's raw data to prove their claims. Accordingly, and for the foregoing reasons, Plaintiffs' Motion to Amend is DENIED. HP's Motions for Summary Judgment are GRANTED. The discovery rulings, other than DMO 10, are hereby affirmed. HP's specific objections to DMO 10 are DENIED as moot.

**IT IS SO ORDERED.**

---

**27.** Plaintiffs did not address HP's argument regarding section 8–4–105 in their Consolidated Opposition to HP's Motions for Summary Judgment.